[No. C045334. Third Dist. May 22, 2006.]

CENTURY SURETY COMPANY, Plaintiff, Cross-defendant and Appellant,
v.
CHARLES A. POLISSO et al., Defendants, Cross-complainants and Respondents.

926

## Counsel

Chapman, Popik & White, Susan M. Popik, David Nied, Merri A. Baldwin; Bonetati, Sasaki, Kincaid & Kincaid and Marilyn L. Bonetati for Plaintiff, Cross-defendant and Appellant.

Bolling, Walter & Gawthrop, Theodore D. Bolling, Jr., Marjorie E. Manning; Farmer, Murphy, Smith & Alliston, George E. Murphy and Suzanne M. Nicholson for Defendants, Cross-complainants and Respondents.

## Opinion

**BLEASE, Acting P. J.**—Century Surety Company (Century), an insurance company, appeals from the judgment after a jury awarded Charles A. (hereafter sometimes Chuck) and Therese (hereafter sometimes Terry) Polisso (the Polissos) and Kinzel Glass Company (Kinzel) $637,911 in total compensatory damages and $2,015,000 in punitive damages on their cross-complaint for, inter alia, breach of contract, breach of the implied covenant of good faith and fair dealing, and malicious prosecution.

In 1996 Chuck Polisso, as "owner" of Kinzel, contracted with S.W. Allen Construction, Inc. (Allen) to install seven glass panels in an underground viewing chamber being built by the United States Forest Service at Taylor Creek near Lake Tahoe. Before the project was completed, a heavy rainstorm hit the Tahoe area and caused the creek to overflow and submerge the viewing chamber, triggering a series of events that resulted in damage to the glass.

In the same year, "Chuck Polisso DBA: Kinzel Glass Co." purchased from Century a commercial lines policy for property damage liability and glass coverage in connection with the Allen contract. The policy covered not only Charles Polisso as a named insured but also his "spouse . . . with respect to the conduct of a business . . . ."

Allen brought suit against Kinzel and "CHARLES A. POLISSO . . . an individual doing business as KINZEL" for damage to the glass and the chamber. Century filed suit against Charles Polisso, Kinzel and Allen for

declaratory relief on coverage issues. Thereafter, Charles and Terry Polisso, "individually and dba KINZEL GLASS CO.," counter-claimed against Century for failing to defend them in the underlying civil action by Allen and failing to pay them for damage to the glass.

On appeal, Century contends inter alia, (1) that Therese lacked standing to sue Century because she was not specifically named as a party in the Allen action or in Century's declaratory relief action, (2) the bad faith and punitive damage awards must be reversed because there was a genuine dispute as to Century's liability under the policy, and (3) the punitive damage award must be reversed because of instructional, evidentiary, and due process violations.

We disagree.

Therese, as Charles's wife, is an insured under the Century policy and Century was obligated to defend her in any action seeking liability "with respect to the conduct of a business . . . ." As Charles's wife and a co-owner of Kinzel she was personally obligated for Kinzel's debts, including any arising from the contract with Allen. For these reasons she has standing to bring the counterclaim against Century.

We also reject Century's genuine dispute claim and sustain the bad faith and punitive damage award and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Underlying Claim*

In 1990, Charles Polisso and his wife Therese, purchased Kinzel, a well-established glass business in Sacramento. Although the business was in Charles's name, doing business as Kinzel, he and Therese were co-owners and both worked in the business.

The United States Forest Service (Forest Service) contracted with Allen to construct an underground stream profile viewing chamber at Taylor Creek near South Lake Tahoe. In August or September 1996, Charles Polisso, as "owner" of Kinzel, entered into a subcontract (hereafter contract) with Allen for $56,000 to install seven multi-layer glass panels in the viewing chamber.[1] Kinzel set the glass in its frames in mid-November 1996, and by mid-December completed the contract work. However, when it became apparent that no sealant had been applied between the metal frame and the concrete

---

[1] The glass was made up of 3 one-half-inch-thick sheets of tempered glass. Kinzel purchased the glass from ACI Glass who purchased it from Hehr Glass.

and that it was necessary to do so, a dispute arose between the Polissos and Allen as to whether the contract required Kinzel to perform that work.

Believing that Kinzel had not completed its contract, Allen withheld payment, so the Polissos retained the services of Attorney Robert Granucci to help them collect from Allen. Granucci agreed to write a letter but suggested the Polissos assist Allen with the additional work to facilitate payment. They agreed to do this, sent some of their workers to complete the additional work, and then left town for a family vacation.

While the Polissos were away, a heavy rainstorm hit the Tahoe area over the New Year's holiday, which caused Taylor Creek to overflow and flood the viewing chamber. The chamber was submerged with flood water for three days, causing solvents left in the chamber by another contractor to spill into the flood water, which deposited a film on the glass panels that remained after the water subsided.

The Polissos returned to Sacramento on January 3, 1997, and learned about the flood. Charles drove to the site on January 10th to view the chamber and was informed Allen was holding Kinzel responsible for the damage to the glass[2] and for delaying completion of the contract. Charles notified his insurance broker about the claim that day. Subsequent cleanup efforts by Allen's workers scratched the glass, causing further damage.[3]

The Forest Service formally rejected the glass panels on February 18 and requested that Allen submit a proposal for the replacement or correction of the rejected work.

### B. *The Insurance Policy*

At the time of the flood, Kinzel was insured under a package commercial lines policy, issued by Century, an Ohio corporation, for the period October 17, 1996, to October 17, 1997. The policy had two parts pertinent to our discussion. The first provided coverage for third party commercial general liability (CGL), which obligated Century to indemnify the insured for property damages the insured became legally obligated to pay to a third party as defined by the policy, and to defend any suit seeking those damages. The policy excluded coverage for damages incurred prior to completion of the Allen contract.

The second part of the policy provided "all risk" first party coverage under an inland marine installation floater endorsement (installation floater or

---

[2] In Allen's view, the film was caused when Kinzel applied excessive sealant to the glass.

[3] Allen disputed the cause of the scratches and denied that its employee caused them.

floater), which covered damage to the glass up to $15,000. Coverage ceased when the glass was installed and became a permanent part of the building and did not cover damage caused by flood water or by faulty or defective materials or workmanship.

We shall discuss the provisions of the policy in greater detail where pertinent to our discussion.

## C. *Century's Bad Faith Denial of Benefits*

Otis Hess, Century's senior claims attorney, supervised the Polissos' claim. Management of coverage issues was assigned to Charles Winkelman.

Rory Green, an independent insurance adjuster, was assigned to investigate the claim. Sometime after January 22, Green interviewed Charles, who advised him that Kinzel had completed the contract work by mid-December and that the contract did not include sealant work between the metal frames and the concrete building. Green prepared a report for Century, dated February 7, 1997, in which he noted there was a dispute between Kinzel and Allen over who was responsible for sealing the metal frames to the cement, but also noted that regardless of who was at fault for the leaky windows, "no damage was sustained as the result of any faulty workmanship." In a subsequent report, Green informed Century that Allen was making an additional claim against Kinzel for the postflood scratches on the glass.

On March 18, 1997, Allen filed suit against Kinzel (*Allen* action), for breach of contract and negligence based upon allegations of delay, defective work and materials, and failure to repair and replace damaged and defective work. Allen served Charles Polisso on March 28th and Therese immediately forwarded the complaint to their insurance broker.

In early April 1997, Winkelman requested a coverage opinion from Century's coverage attorney, Callie O'Hara, and advised her that according to the Polissos, Kinzel completed the work specified in the contract by mid-December. In late June, O'Hara sent Winkelman her opinion, advising that the policy did not provide coverage under either the CGL or floater and there was no duty to defend.

Meanwhile, the Polissos had not heard from Century about their answer in *Allen*. Fearing it would not be filed on time, Therese faxed O'Hara a letter on June 30, reiterating that Kinzel's work under its contract was complete at the time of the flood, and requested that O'Hara contact her before the time to file their answer expired.

O'Hara spoke to Granucci that same day and advised him there was no coverage and that Century would not be filing a cross-complaint on behalf of the Polissos. Granucci expressed surprise and asked her to provide the facts she was relying on in denying coverage. O'Hara also sent Winkelman a letter advising him that Granucci had confirmed that Kinzel's work was complete at the time of loss and asked Winkelman to contact her to "discuss the implications of this assertion."

The following day, Century sent a denial letter to Charles. The reasons stated for denying coverage under the CGL policy was that it did not provide coverage for indemnity or defense for damage to personal property in the custody or control of the insured, damage to real property the insured was still working on, and damage to property resulting from Kinzel's faulty work, and there was no coverage under the floater because it did not cover damage to the glass from flooding and defective workmanship. The letter also informed Charles that Century had obtained an extension to file an answer up to July 7, 1997, which it had instructed the Los Angeles based law firm of Federman, Gridley & Gradwohl (Gradwohl) to prepare and file as a "courtesy."

O'Hara actually prepared and forwarded the answer to Gradwohl. It was a general answer to a verified complaint. When Granucci received a copy, he telephoned Gradwohl and advised him a general answer was an inadequate response to a verified complaint (Code Civ. Proc., § 446) and that he would have to file an amended verified answer. Granucci also informed Gradwohl he should file a cross-complaint to preserve the Polissos' affirmative claims. Gradwohl prepared both pleadings but advised the Polissos he was not authorized to do anything else.

O'Hara and Granucci exchanged several letters in July over the question of coverage, leading O'Hara to advise Winkelman in early September that the facts confirmed by Granucci created a " 'potential' for coverage under Century's policy, such that a duty to defend the insured now exists . . . ." She recommended that a reservation of rights be sent to the insured and that Northern California counsel be substituted as counsel of record. A few days later, Dan Costa, one of Century's Northern California defense attorneys, was assigned to defend Kinzel and Charles in the *Allen* action.

Century then notified Charles it would provide him with a defense under a full reservation of rights, but denied him coverage for independent counsel, for indemnity, and for coverage of the glass. The Polissos did not understand the significance of the reservation of rights and believed Century would be providing them with a full defense.

The Polissos' belief was confirmed when Costa assured them they had a good case and would receive a "Cadillac defense." He recommended amending Kinzel's cross-complaint to bring in additional defendants, and Century paid him in full for his work on these affirmative claims. On December 23, Hess sent Costa a letter informing him that Winkelman would be handling the litigation and he would be handling coverage matters. Nevertheless, Hess directed Costa to postpone depositions pending early mediation to reduce Century's legal fees and enclosed a proposed set of special interrogatories to be served on Allen.

Costa complied with Hess's directives and in late November or early December, he advised the Polissos they should be ready to take 20 cents on the dollar and walk away from the litigation. Needless to say, they were shocked and could not understand the basis for his sudden change of view.

Meanwhile, because the Polissos' debts were mounting and they were unable to pay their payroll taxes, a notice of federal tax lien was issued. To pay off the lien, they borrowed money from Therese's father. Their deteriorating finances and the stress of the *Allen* litigation began to adversely affect their health, their marriage, and their children. Charles started to drink and Therese, who was having heart palpitations and was not sleeping, began seeing a mental health therapist.

In March 1998, after reviewing Allen's responses to the special interrogatories and a status report from Costa, O'Hara sent Hess a letter recommending that Century file a declaratory relief action against Charles Polisso on the duty to defend and for reimbursement of defense costs. This action was to serve as a "negotiating tool" in mediating the *Allen* action. O'Hara also recommended that Costa serve a statutory offer to compromise in the amount of $15,000. She explained that while the insured had "an excellent chance" of obtaining a defense verdict if the claim proceeded to trial and that there were $12,761 in "arguably covered" damages, "the cost of 'vindicating' the insured appears to far exceed the settlement value of this claim."

Following O'Hara's recommendation, Century filed an action for declaratory relief and reimbursement of legal fees on March 24, 1998. Therese contacted Costa for assistance but he advised her he could not help her. Charles became even more withdrawn and depressed. He began having panic attacks and heart palpitations and continued to lose sleep, as did Therese.

Therese asked O'Hara for a 45-day extension in which to file their answer so she could find an attorney to represent them but O'Hara, who wanted leverage in the upcoming *Allen* mediation, only agreed to a 15-day extension of time.

On Granucci's recommendation, the Polissos retained Craig Farmer, and he prepared and filed an answer to Century's declaratory relief action as well as a cross-complaint against Century for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief that Century had a duty to defend and to provide independent counsel. This cross-complaint forms the basis of the present proceedings.

On May 11, Farmer asserted the Polissos' right to independent counsel on the ground Dan Costa, Century's panel defense counsel, had a conflict of interest because he was defending the Polissos in the *Allen* action under a reservation of rights.

On June 25, Farmer advised O'Hara that the Polissos were feeling tremendous financial pressure as a result of Century's lawsuit against them and asked her to consider waiving Century's right to reimbursement of its legal fees. She refused the request and told him Century had filed the action as "a scare tactic."

Despite their dire finances,[4] the Polissos wanted Farmer to represent them. They did not trust Costa. Century finally agreed to retain Farmer as independent counsel but only subject to a reservation of rights. Farmer agreed to accept Century's regular rate of $110 per hour, to be billed monthly with payment due within 30 days, unless an objection to the billing was received within 15 days.[5]

On August 25, 1998, Century filed a motion for summary judgment in its declaratory relief action and noticed the hearing two days before the scheduled *Allen* mediation. Because opposing this motion would compromise the Polissos' defense in *Allen*, Farmer obtained a stay of Century's action.

Meanwhile, O'Hara directed Farmer to send her the bills for his legal fees. Although Century paid his August bill for $3,826.60, O'Hara told Hess she would carefully review all of Farmer's future bills because she feared he would attempt to submit bills for his work as coverage counsel in the guise of defense work. Century then failed to pay Farmer's bills for September through mid-December 1998, which totaled $17,164.61.

Farmer was unsuccessful in his efforts to contact O'Hara to discuss payment, and sent another bill on December 28, which brought the unpaid

---

[4] The Polissos were tapped out and had to borrow $15,000 from Therese's father to keep the business afloat. Other funds from a settlement and insurance proceeds for damages and losses sustained in an automobile accident and a burglary were used to run the business, support the family, and purchase a badly needed automobile.

[5] O'Hara subsequently sent Farmer a letter directing him to associate in as counsel with Costa despite the fact it would increase the Polissos' potential exposure to a reimbursement claim for defense costs and would compromise Farmer's independence. Farmer refused.

balance to $39,292.22. After numerous telephone calls by Farmer and excuses by O'Hara, she sent him a bill audit, which challenged many of his entries as uncovered work. Unable to contact O'Hara by telephone, Farmer sent her a letter on February 1 describing his efforts, reiterating their payment agreement, and emphasizing that he could not afford to act as a line of credit for Century. On February 4, Century made a payment of $30,392.22, with no accompanying audit to show which entries were not paid. That left Century $33,379.32 in arrears through February 1999.

Trial in the *Allen* action began on February 3, 1999, and lasted until mid-March. By the end of trial, Century owed Farmer $68,768.03. At one point, he discovered the telephone number O'Hara had given him had been disconnected.

On March 19, Farmer sent Hess an e-mail advising him that he had not received payment and inquired when payment would be made. Hess advised him by letter dated March 22 that he was unaware of any agreement to satisfy some portion of his outstanding fees on or before March 19 and was disinclined to pay any bill he had not reviewed. The letter went on to state that Century had already paid Farmer in excess of $30,000, and did not believe there was coverage for the *Allen* litigation, or if there was any, it would be very minor. Because Century had reserved the right to bring an action to recover fees paid for uncovered services, it would not acquiesce in any additional payment because of the possibility there was already a significant overpayment.

Farmer then turned to O'Hara and informed her the Polissos needed to know whether Century was going to pay for his services. He advised her that Century should immediately pay the undisputed portions of the bills and identify which charges should be arbitrated. On April 15, she directed Farmer to cease communicating with Hess and promised to discuss the fee bills with Farmer on April 19. On that date she left a message for Farmer that she would discuss the matter with Hess and that "she would imagine that maybe they would be able to get [him] some money . . . within maybe a couple of weeks."

Meanwhile, O'Hara directed Costa to take whatever steps were necessary to obtain a statement of decision from the trial court in *Allen* on issues determinative of coverage in Century's declaratory relief action.

Farmer told the Polissos he could not continue to represent them without payment and suggested they allow Costa to prepare their closing trial brief in *Allen,* but they did not trust Costa to represent them. So, Therese offered Farmer $5,000 from a recent inheritance and pledged to put up some of her

jewelry as collateral in the event Century did not pay the balance owed to him. When Century failed to pay Farmer by May 11, the Polissos paid him as agreed.

On June 1, after several more contacts with O'Hara, Century sent Farmer a check for $36,137.08. However, the accompanying letter directed him to place this money and all prior payment from Century in trust except for his firm's out-of-pocket expenses, because it was clear the court in the declaratory relief action would find little or no coverage and Century would then seek reimbursement of those funds from the Polissos. Farmer did not comply with this request and continued to bill Century for the unpaid balance, which by then totaled $58,621. He was forced to sue Century for the balance in a separate action.

The outcome of the *Allen* action was a net zero between the Polissos and Allen. However, as a result of the Polissos' mounting debt, they got further and further behind in their rent, which led to the loss of their business lease for premises Kinzel had occupied since 1949. As a result, they were forced to move Kinzel to a less desirable location, which had serious adverse consequences for the business.

D. *Present Proceedings*

On December 20, 1999, Century filed an amended pleading. In addition to the claims stated in its original complaint, it sought declaratory relief on its duty to pay Kinzel for the glass under the floater and for reimbursement of $200,000 in defense fees paid to Farmer.

Knowing they were unable to pay the fees in the event Century prevailed, the Polissos feared the loss of their home and filed for bankruptcy in April 2000.

Century and the Polissos brought a series of motions and cross-motions for summary judgment and summary adjudication resulting in pretrial determinations on several of the Polissos' claims. The trial court denied Century's motion for summary judgment and granted the Polissos' three motions for summary adjudication. It concluded (1) Century had a duty to defend the Polissos and provide them with independent counsel in the *Allen* action, and (2) the installation floater covered damage to the glass.

Meanwhile, on October 25, 2000, the Polissos filed a first amended and supplemental cross-complaint against Century, asserting a cause of action for

declaratory relief under the floater, an additional seven causes of action in tort,[6] and a request for punitive damages.

Century dismissed its complaint with prejudice on November 1, 2002, and the matter proceeded to trial on the Polissos' amended cross-complaint. At Century's request, the trial court bifurcated the trial on the punitive damages claim (Civ. Code, § 3295, subd. (d)) and at the close of the evidence, the trial court granted the Polissos' motion to amend their cross-complaint to add a cause of action for malicious prosecution.

The jury returned a special verdict, finding in favor of the Polissos, and awarding them compensatory and punitive damages. The jury made the following findings: Century breached the implied covenant of good faith and fair dealing in the insurance contract; Century did not reasonably rely on the advice of counsel in breaching that covenant; the Polissos sustained $320,911 in economic tort damages as a result of that breach; Therese sustained $2,000 in medical expenses and $200,000 in noneconomic damages; and Charles sustained $100,000 in noneconomic damages. The jury further found the Polissos suffered economic and noneconomic damages as a result of the filing of the declaratory relief action without probable cause and with malice, and that Century failed to perform its obligations under the first party and third party liability provisions of the insurance contract, causing the Polissos an additional $15,000 in contract damages. Last, the jury found Century committed malice, fraud, or oppression in connection with the bad faith and malicious prosecution claims.

At the punitive damages phase of the trial, the parties stipulated that Century's net worth was $56,921,567 and the jury assessed Century $2,015,000 in punitive damages.

The trial court accepted the special verdict and ordered Century to pay the Polissos compensatory and punitive damages in the amount determined by the jury and also awarded $16,997.31 in prejudgment interest. Century appeals from the judgment.

---

[6] These seven claims were all subsequently dismissed.

DISCUSSION

I.

Standing

A. *Breach of Contract and Bad Faith*

Century contends the judgment must be reversed because Therese did not have standing to sue it for breach of contract and breach of the implied covenant of good faith and fair dealing. It argues it had no contractual obligation to provide her with coverage under the CGL policy because she was not a named defendant in the *Allen* action and it had no obligation to pay her under the installation floater because she was not a named insured under that policy.

The Polissos argue this claim is without merit because Century ignores the policy language and relies on a line of cases with different contractual language. They further argue that the floater is a part of the policy and the definition of an insured under the CGL part also governs the floater. We agree with the Polissos as to the CGL part but differ in our analysis of the floater, which we find does not cover Therese. Nevertheless, we find the trial court's ruling to the contrary is harmless error.

■ Because insurance policies are contracts, "[t]he rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).)

1. *CGL Policy*

The CGL policy begins with the general language, "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." The named insured in the policy is "Chuck Polisso DBA: Kinzel Glass Co." and the form of business is described as "Individual." A designation that Chuck Polisso is an individual doing business as Kinzel indicates he is a sole proprietor who is doing business under the fictitious name Kinzel Glass Company. (*Providence Washington Ins. Co. v. Valley Forge Ins. Co.* (1996) 42 Cal.App.4th 1194, 1200 [50 Cal.Rptr.2d 192].)

Under this language of the policy, Charles and Kinzel are both named insureds. Therese, however, is an insured under the policy's definition of an

insured, which includes the insured's spouse. It states "[i]f you are designated in the Declarations as . . . [a]n individual, *you and your spouse* are insureds, but only with respect to the conduct of a business of which you are the sole owner." (Italics added.)[7] Because the policy designates Charles "in the Declarations" as an individual doing business as Kinzel and the *Allen* action involved work performed by Kinzel pursuant to a contract between Allen and Chuck Polisso, as "owner" of Kinzel, Therese, as Charles's spouse, is an insured with respect to the conduct of the Kinzel business and hence is insured against liability arising from the work performed by Kinzel for Allen.

Turning to the coverage provision of the policy, section I sets forth the insurer's defense obligation for property damage liability. The insuring agreement states: "We will pay those sums that the insured becomes *legally obligated to pay* as damages because of . . . 'property damage' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages. . . ." (Italics added.)[8]

■ As we discuss in greater detail in part II., "an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the *potential for coverage* under the insuring agreement." (*Waller, supra,* 11 Cal.4th at p. 19, italics added.) Thus, under the terms of the policy, Century had a duty to defend Therese if three conditions were met: (1) Therese was an insured under the policy, (2) a civil suit was filed that sought damages where there was a potential for coverage under the policy, and (3) Therese would become legally obligated to pay those damages. Applying these provisions, it is clear Century had a duty to defend Therese under the CGL policy and failed to do so.

As stated, Therese is an insured under the policy. Second, Allen filed a civil suit against Charles and Kinzel alleging that Charles and Kinzel negligently caused damage to its property. As we show in part II.A., Allen alleged facts in the civil suit that gave rise to the potential for coverage. Third, and contrary to Century's assertion, in the event Allen prevailed against Charles, Therese as his wife would be legally obligated to pay a judgment against Charles.

Century argues that because Therese was never sued by Allen, there was no possibility she would become legally obligated to pay damages arising from the *Allen* action. We disagree.

---

[7] Century does not argue that this definition is inapplicable because Charles is not the sole owner of Kinzel. It could not do so given the fact the contract with Allen was in the name of Chuck Polisso as "owner" of Kinzel glass and Century insured Charles Polisso from damage arising from the contract in that capacity, as an individual doing business as Kinzel.

[8] A "suit" is defined as "a civil proceeding in which damages because of . . . 'property damage,' . . . to which this insurance applies are alleged."

■ "[T]he community estate is liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and *regardless of whether one or both spouses are parties to the debt or to a judgment for the debt.*" (Fam. Code, § 910, italics added; see Code Civ. Proc., § 695.020; *Lezine v. Security Pacific Fin. Services, Inc.* (1996) 14 Cal.4th 56, 64 [58 Cal.Rptr.2d 76, 925 P.2d 1002].) More specifically, community property is liable for a money judgment against one spouse whether or not the other spouse is a named defendant in the underlying action. (*Lezine v. Security Pacific Fin. Services, Inc., supra,* 14 Cal.4th at p. 64; see also Fam. Code, § 1000, subd. (b)(1) [the liability of a married person for an act performed for the benefit of the community is first satisfied from the community estate and then from the separate property of the married person].)

Kinzel is a family owned business and the Allen contract was entered into and performed for the benefit of the community. Because the Polissos purchased and operated Kinzel during their marriage, it is community property. (Fam. Code, § 760.) As Charles's spouse with a community property interest in the business, Therese would be legally obligated to pay a judgment against him. (Fam. Code, §§ 910, 1000, subd. (b)(1); *Lezine v. Security Pacific Fin. Services, Inc., supra,* 14 Cal.4th at p. 64; *Oyakawa v. Gillett* (1992) 8 Cal.App.4th 628, 631 [10 Cal.Rptr.2d 469].)

However, Century relies on language in *Evans v. Pacific Indemnity Co.* (1975) 49 Cal.App.3d 537, 542 [122 Cal.Rptr. 680] (*Evans*), where the court stated that "[a] judgment for money damages is one subject, while collection of a judgment rendered against a spouse is another and quite independent subject." From this, Century argues that Therese's liability for the judgment cannot be equated with the community estate's liability for the judgment.[9]

We find that *Evans, supra,* 49 Cal.App.3d 537, is inapposite and the language relied on by Century is dicta. *Evans* involved a suit by a husband and wife for indemnity where the husband had engaged in willful and

---

[9] Century also mistakenly relies on *Oyakawa v. Gillett, supra,* 8 Cal.App.4th at page 631, for the same principle. In *Oyakawa,* the appellate court rejected a judgment creditor's efforts to amend the judgment by adding the wife of the judgment debtor to the judgment. The court reasoned thusly, "[a]lthough community property is liable for a debt incurred by either spouse during marriage [citation], it does not follow that a wife can be added to a judgment rendered against her husband in an action in which she was not named and had no opportunity to defend. *Indeed, no such amendment is necessary* because the Legislature has declared that, '[e]xcept as otherwise expressly provided by statute, the community property is liable for a debt incurred by either spouse . . . during marriage . . . *regardless whether one or both spouses are parties to the debt or to a judgment for the debt.*' [Citation.]" (*Ibid.,* first italics added.) Thus, *Oyakawa* supports the Polissos' position that Therese is liable for a judgment against Charles.

intentional conduct (assault and battery), which was an excluded event. (Ins. Code, § 533.) The wife was not entitled to indemnification because she was not named in the judgment and the marital relationship did not give rise to an independently insurable event that would place her insurable interest outside the statutory exclusion. By contrast, here there is no excluding event and Century does not base its standing argument against Therese on a lack of coverage for Kinzel or Charles.

The question before us turns on the meaning of the phrase "legally obligated to pay." In construing it, we apply the rules of construction, which state that "policy language is interpreted in its ordinary and popular sense [citation] and as a 'layman would read it and not as it might be analyzed by an attorney or an insurance expert.' " (*E.M.M.I., Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 471 [9 Cal.Rptr.3d 701, 84 P.3d 385].) Moreover, language in an insurance policy must be interpreted as a whole and in the circumstances of the case. (*Ibid.*) " ' " '[A]mbiguous language is construed against the party who caused the uncertainty to exist. [Citation.]' 'This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured." ' " [Citation.] "Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations." ' [Citation.].)" (*Id.* at pp. 470–471.) Since Century drafted the policy, we shall construe any ambiguity against Century.

The phrase "legally obligated to pay," is broadly worded. It is not qualified by words of limitation that require the insured to be personally, directly, or immediately obligated to pay. While the phrase may be applied to a spouse whose liability arises from a judgment in which he or she is named, it also may be applied to a spouse whose liability arises from a judgment that may be collected from the spouse from her community assets.

Because the policy must be considered as a whole, we also consider the phrase in light of the definition of an insured. Therese is an insured under the policy as the spouse of the business owner, not as a partner or employee of the business. An individual who owns the assets of a sole proprietorship is personally liable for all debts and responsibilities incurred by the business. (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 283 [211 Cal.Rptr. 703, 696 P.2d 95], superseded on other grounds as stated in *Pacific Custom Pools, Inc. v. Turner Construction Co.* (2000) 79 Cal.App.4th 1254, 1261 [94 Cal.Rptr.2d 756].) Thus, the only reasonable purpose for designating as an insured the spouse of an individual business owner is to protect the spouse's interests in the community estate. Certainly a layman would understand the phrase "sums that the [the spouse of the named insured] becomes legally obligated to pay" to include any judgment for which the spouse's community assets would be liable.

Kinzel, as a family owned business, was the main asset of the Polissos' community estate. Since the estate is liable for any money judgment against Kinzel or Charles arising from the *Allen* suit (Fam. Code, §§ 910, 1000, subd. (b)(1); Code Civ. Proc., § 695.020), it is reasonable to conclude Therese also would be legally obligated to pay that judgment within the meaning of the policy. Accordingly, we conclude under the terms of the insurance policy that Century had a duty to defend Therese in the *Allen* action, giving her standing to sue Century for breach of that duty.

The cases relied on by Century do not advance its claim because, unlike in the present case, in those cases, the express terms of the insurance policies imposing a duty to defend required that the insured be a *named* defendant in the underlying suit. (See *Western Polymer Technology, Inc. v. Reliance Ins. Co.* (1995) 32 Cal.App.4th 14, 28 [38 Cal.Rptr.2d 78] [" 'a duty to defend any suit *against the insured*,' " italics added]; *American Continental Ins. Co. v. American Casualty Co.* (2001) 86 Cal.App.4th 929, 934, fn. 2, 938–939 [103 Cal.Rptr.2d 632] [a duty to defend only when the insured received "a demand for money or services naming you," italics omitted]; *Spencer v. State Farm Mut. Auto Ins. Co.* (1957) 152 Cal.App.2d 797, 798–799 [313 P.2d 900] [" 'any suit against the insured . . . .' "].)[10]

For these reasons we also conclude Therese had standing to bring suit against Century for breach of the covenant of good faith and fair dealing, which is an implied term in every insurance contract. (*Waller, supra,* 11 Cal.4th at pp. 35–36; *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1151–1153 [271 Cal.Rptr. 246].) Since we have concluded Therese has standing to sue Century for breach of the contract, she necessarily has standing to sue it for breach of the implied covenant.

### 2. *Installation Floater*

Century also contends Therese was not an insured under the Installation Floater part of the policy. It argues that while the CGL form and the Installation Floater form were parts of the same policy, each form was subject to its own terms, conditions, and definitions, and those terms and definitions are not interchangeable. The Polissos argue that because the two forms are

---

[10] Century also mistakenly relies on *San Diego Housing Com. v. Industrial Indem. Co.* (1998) 68 Cal.App.4th 526, 542 [80 Cal.Rptr.2d 393], which did not involve a duty to defend and *Lofberg v. Aetna Casualty & Surety Co.* (1968) 264 Cal.App.2d 306, 308 [70 Cal.Rptr. 269], which merely held that an insurer has no obligation to appear and defend an uninsured stranger.

part of the same policy, the same definitions applicable to the CGL part also apply to the floater.[11] We agree with Century.

The common declarations of the Polissos' commercial lines policy state, inter alia, the policy number, the terms of the policy, and the named insured, Chuck Polisso doing business as Kinzel Glass Co. As discussed *ante*, the CGL part includes a section defining who is an insured and provides coverage for sums "the *insured* becomes legally obligated to pay . . . [and] to defend any 'suit' seeking those damages." (Italics added.) Neither the common declarations of the policy, the CGL definitions, or the floater declarations expressly make the CGL definitions applicable to the floater.

To the contrary, the floater includes a form captioned "COMMERCIAL INLAND MARINE GENERAL CONDITIONS." It begins with the statement, "[t]he following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Individual Commercial Inland Marine Coverage Forms." Moreover, the third paragraph states, "Throughout this policy, the words 'you' and 'your' refer to the Named Insured shown in the Declarations. . . ." The coverage form of the floater states, "We insure *your* property, including property for which *you* are legally responsible . . . ." (Italics added.)

In sum, the CGL part provides third party liability coverage to the insured, defines who is an insured, and agrees to pay sums the "insured" becomes legally obligated to pay and to defend the "insured." The floater, on the other hand, provides first party coverage to the named insured for damage to the glass. It therefore covers only the property for which it is obligated to pay to the named insured, Charles Polisso.

Thus, under the terms of the policy and the nature of the floater, we hold that the CGL definition of insured does not apply to the floater and Therese is not an insured under the floater. The trial court therefore erred when it ruled to the contrary.

Nevertheless, our conclusion does not mean that Therese does not have standing to sue Century for breach of the implied covenant of good faith and fair dealing. She retains her standing because she is an insured under the

---

[11] The Polissos also argue that Century cannot raise this claim for the first time on appeal. It is true Century failed to raise this specific defense in its motion for summary judgment and summary adjudication. It argued only that Therese is not entitled to pursue this action because she was not a defendant in the underlying action. However, even if we assume that claim was not broad enough to include the present question, we shall exercise our discretion to address it on appeal because it involves a question of law based on undisputed facts. (*Waller, supra,* 11 Cal.4th at p. 24.)

CGL part. Century contends the error requires reversal of the judgment in its entirety because Therese's claims infected the entire trial and it is impossible to separate the portion of the judgment attributable to her claims. It bases this argument on the assumption Therese is not covered by the policy at all and fails to address the issue in the context of our holding that Therese is covered by the CGL part but not the floater.

Nevertheless, we have considered the issue and find the trial court's ruling is harmless error.

Century argues the error prejudicially affected the jury's award of compensatory and punitive damages because Therese was allowed to testify about her feelings and emotions concerning all the events preceding the trial and the manner in which Century's misconduct affected her personally. We disagree.

As we have found, Therese is an insured under the CGL part and therefore Century had a duty to defend her, giving her standing to sue Century for bad faith failure to defend. Her testimony on the issues of malice, the nature of Century's conduct, and the economic and emotional harm it caused her remains fully admissible. As such, the trial court's ruling had no effect on the admissibility of any of the evidence or the jury's findings.

This is demonstrated by Century's failure to cite a single instance where Therese's testimony about her emotional distress was attributable solely to its failure to pay under the floater. Nor have we found any such testimony. Indeed, Century's citations all relate to Therese's emotional and physical problems stemming from its failure to defend the Polissos under the CGL part. Nor is there anything to show the compensatory damage award for Therese's depression, heart palpitations, and loss of sleep and hair was attributable to Century's failure to pay a mere $15,000 on the floater. That amount pales in light of the amount of money the Polissos were potentially liable for in the *Allen* suit and in Century's action for reimbursement of $200,000 in attorney fees, not to mention the stress of those two suits and Century's conduct in failing to properly defend them.

We conclude it is not reasonably probable the jury's $200,000 award to Therese for emotional distress would be any different in the absence of the trial court's erroneous ruling. (Cal. Const., art. VI, § 13; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 939 [22 Cal.Rptr.3d 530, 102 P.3d 915].)

■ Similarly, it is not reasonably probable the trial court's error affected the punitive damage award. That award is based upon a breach of an obligation not arising from contract where the jury finds the defendant guilty of malice. (Civ. Code, § 3294, subd. (a).) The award is made not to

compensate the plaintiff but to punish the defendant for its conduct and to deter similar conduct. (*Pacific Mut. Life Ins. Co. v. Haslip* (1991) 499 U.S. 1, 19 [113 L.Ed.2d 1, 20–21, 111 S.Ct. 1032] (*Haslip*).)

In determining the amount of the award, the jury must consider the reprehensibility of the defendant's conduct and the amount of damages that will have a deterrent effect in light of the defendant's financial condition, and there must be a reasonable relation between the award and the harm actually suffered by the plaintiffs. (BAJI No. 14.72.2.) Consideration of these factors was in no way impacted by Therese's lack of coverage under the floater. Accordingly, the error did not prejudicially affect the jury's award of punitive damage.

### B. *Malicious Mischief*

Century contends the judgment in favor of Therese for malicious prosecution must be reversed for several reasons[12] including her lack of standing to sue on that claim because she was not named in Century's action for declaratory relief.

The Polissos argue that any alleged errors in connection with their claim for malicious prosecution are harmless because the jury did not award any damages for that cause of action. We agree with the Polissos and therefore reject all of Century's arguments relating to that claim.

A judgment will not be reversed for instructional error, pleading error, or other procedural error in the absence of a miscarriage of justice. (Cal. Const., art. VI, § 13.) "In the case of civil state law error, this standard is met when 'there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.' " (*Elsner v. Uveges, supra,* 34 Cal.4th at p. 939, quoting *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

We find no miscarriage of justice. As stated, the jury returned a special verdict finding Century breached the implied covenant of good faith and fair dealing and awarded the Polissos compensatory damages for that breach. The

---

[12] Century also claims the judgment must be reversed because the trial court abused its discretion in granting the Polissos' 11th-hour motion to amend their complaint to state a claim for malicious prosecution, that Century was not liable for malicious prosecution because it had probable cause to file the declaratory relief action, and the jury was improperly instructed on probable cause.

judgment made no reference to the cause of action for malicious prosecution and no award of damages was based on that claim.[13]

We therefore conclude that any errors asserted by Century in connection with the claim for malicious prosecution were harmless because they did not affect the judgment. (*Conaway v. Toogood* (1916) 172 Cal.706, 713 [158 P. 200] [misjoinder of wife was harmless where no damages were awarded]; *Jones v. Peck* (1923) 63 Cal.App. 397, 402 [218 P. 1030] [misjoinder of plaintiffs was harmless where no relief was granted].)

## II.

### Genuine Dispute Doctrine

Century contends the bad faith and punitive damage awards must be reversed because there were genuine disputes as to its legal liability under the CGL policy and the Installation Floater. It argues that the trial court should have resolved this issue pretrial rather than allowing it to go to the jury. This error, Century asserts, coupled with the trial court's refusal to give Century's proposed jury instruction on the issue, amounted to prejudicial error. The Polissos counter there was no genuine dispute under either part of the policy.[14] We agree with the Polissos.

As with all contracts, insurance contracts include an implied covenant of good faith and fair dealing, which requires that each contracting party refrain from doing anything to injure the right of the other party to receive the benefits of the agreement. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141].) When the insurer engages in unreasonable conduct in connection with an insured's insurance claim, the insurer is said to have tortiously breached the implied covenant. (*Id.* at pp. 818–819.) That covenant applies equally to third party claims as well as to first party claims by the insured. (*Id.* at p. 818.) "In both contexts the obligations of the insurer 'are merely two different aspects of the same

---

[13] The jury found the Polissos suffered economic and noneconomic damages in connection with its findings on the malicious prosecution claim but did not award them any damages on that claim because it found such damages would be duplicative of the damages awarded for the bad faith claim.

[14] The Polissos initially contend Century forfeited this argument by failing to raise it in the trial court. We disagree. As a general rule, a new theory may be presented for the first time on appeal if it raises a question of law that can be decided on undisputed facts. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 983 [105 Cal.Rptr.2d 88].) Because the question whether there was a genuine dispute is a question of law that may be decided on undisputed facts (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 818 [274 Cal.Rptr. 820, 799 P.2d 1253]), we shall consider it.

duty.' [Citations.] '[When] the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.' [Citations.] For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own. [Citation.]" (*Id.* at pp. 818–819.)

Thus, a breach of the implied covenant of good faith and fair dealing involves something more than a breach of the contract or mistaken judgment. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345 [108 Cal.Rptr.2d 776] (*Chateau*).) There must be proof the insurer failed or refused to discharge its contractual duties not because of an honest mistake, bad judgment, or negligence, "but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." (*Id.* at p. 346.)

■ To establish a bad faith claim, the insured must show that (1) benefits due under the policy were withheld and (2) the reason for withholding the benefits was unreasonable or without proper cause. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 920 [148 Cal.Rptr. 389, 582 P.2d 980]; *Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205 [10 Cal.Rptr.2d 352]; *Love v. Fire Ins. Exchange, supra,* 221 Cal.App.3d at pp. 1151–1152.)

To defeat the element of unreasonable denial of benefits, Century asserts the genuine dispute doctrine. That doctrine holds that an insurer does not act in bad faith when it mistakenly withholds policy benefits, if the mistake is reasonable or is based on a legitimate dispute as to the insurer's liability. (*Chateau, supra,* 90 Cal.App.4th at p. 346, quoting *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1280–1281 [31 Cal.Rptr.2d 433]; see also *Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282, 1292 [97 Cal.Rptr.2d 386]; *Opsal v. United Services Auto. Assn., supra,* 2 Cal.App.4th at p. 1205.)

We evaluate the reasonableness of the insurer's actions and decision to deny benefits as of the time they were made rather than with the benefit of hindsight. (*Chateau, supra,* 90 Cal.App.4th at p. 347.) With these general principles in mind, we turn to Century's specific arguments.

### A. *Duty to Defend Under the CGL Part*

Century relies on two factual disputes, which it argues gave rise to a genuine dispute as to whether it had a duty to defend under the CGL policy.

First, it argues there was a genuine dispute as to whether Kinzel had failed to complete its work under the contract at the time of the flood, which in turn raised the legal question whether property damage to the glass fell outside the policy's "completed operations" coverage. Second, it argues there was a genuine dispute as to whether the claimed property damage resulted from Kinzel's faulty workmanship and therefore fell within the faulty workmanship exclusion.

As the Polissos argue, Century is mistaken because it confuses its duty to indemnify with its duty to defend. We agree with the Polissos. Even if there were genuine coverage issues at the time the claim was tendered, there was no genuine dispute as to Century's duty to defend under the policy.

 The Supreme Court in *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*), restated the general principles governing adjudication of the insurer's duty to defend. " '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] . . . "[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]' [Citation.]

" 'The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citation.]' [Citation.] . . . '[F]or an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit. [Citation.] Hence, the duty "may exist even where coverage is in doubt and ultimately does not develop." [Citation.]' [Citation.]

"The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . . Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf. [Citation.]" (*Montrose, supra,* 6 Cal.4th at p. 295.)

Moreover, facts known to the insurer, which are extrinsic to the third party complaint, may give rise to the duty to defend even if the complaint does not reflect a potential for liability under the policy. (*Montrose, supra*, 6 Cal.4th at p. 296.)

Because the duty to defend is broader than the duty to indemnify, any doubt as to whether the facts establish the existence of the duty to defend is to be resolved in favor of the insured. (*Waller, supra,* 11 Cal.4th at p. 19; *Montrose, supra,* 6 Cal.4th at pp. 299–300.) While the insured has the initial burden of showing the claim falls within the basic scope of coverage, the insurer has the burden of showing the claim falls within an exclusion, and exclusions are narrowly construed. (*Waller, supra,* 11 Cal.4th at p. 16.)

Century has failed to cite any cases that apply the genuine dispute doctrine to the duty to defend and our research has not disclosed any. The doctrine has been applied primarily in first party coverage cases, usually involving disputes over policy language or its application. (See *Fraley v. Allstate Ins. Co., supra,* 81 Cal.App.4th at p. 1292; *Chateau, supra,* 90 Cal.App.4th at p. 347; *Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at pp. 1280–1281; *Opsal v. United Services Auto. Assn., supra,* 2 Cal.App.4th at p. 1205; *Guebara v. Allstate Ins. Co.* (9th Cir. 2001) 237 F.3d 987, 992; *Safeco Ins. Co. of America v. Guyton* (9th Cir. 1982) 692 F.2d 551; see also Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶¶ 12:837–12:840.1, pp. 12C-11 to 12C-14.) It has also been applied in a third party indemnity case. (*Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 523 [46 Cal.Rptr.2d 845].)

Assuming the doctrine is equally applicable in a duty to defend case, we conclude Century has failed to show it is applicable in this case. As previously stated, the policy imposed a duty on Century to defend the Polissos in a third party lawsuit seeking property damages covered by the policy. Century claims there was a genuine dispute as to policy exclusions that applied if the insured's work was not completed and operations were ongoing at the time of the occurrence that caused the property damage. Additionally, the policy excluded faulty workmanship property damage caused by the insured's faulty work unless the work was completed at the time of the occurrence.[15]

---

[15] The policy excludes damage to personal property in the care, custody or control of the insured, property damage arising out of operations by the contractors or subcontractors working on behalf of the insured, and property that must be restored, repaired or replaced because the insured's work was incorrectly performed. However, the faulty work exclusion does not apply to property damage included in the "products-completed operations hazard." The policy defines "Products-completed operations hazard" to include "all . . . 'property damage' occurring away from premises you own or rent and arising out of 'your product' or

In determining whether Century had a duty to defend the Polissos, we first consider the allegations in the Allen complaint (*Montrose, supra*, 6 Cal.4th at p. 295), which alleged, inter alia, that Kinzel negligently installed the glass in the underground viewing chamber, that as a proximate result of Kinzel's negligent acts, Allen incurred costs and damages to replace and repair the glass and the work and materials of other trades which were also damaged by Kinzel's negligent work. In addition, Century was aware that according to the Polissos, Kinzel had installed the glass windows and had completed that contract well before the flood and the resulting damage to the glass windows.

In short, the complaint, coupled with extrinsic evidence known to Century at the time the Polissos tendered their claim, gave rise to the potential for coverage under the CGL policy based on allegations that Kinzel's work caused property damage to the work and materials of other subcontractors after Kinzel had completed its contract.

Indeed, there was no legitimate dispute between Century and the Polissos over Century's duty to defend them. As early as September 10, 1997, O'Hara advised Century that the facts as stated by the Polissos' counsel created a " 'potential' for coverage under Century's policy, such that a duty to defend the insured now exists with regard to the captioned claim."

The dispute between Allen and Kinzel as to whether Kinzel's work was faulty and whether the subcontract required Kinzel to perform the additional sealant work bore on the question whether Kinzel had completed its work. Those two disputes were only relevant on the questions of Kinzel's liability to Allen and Century's duty to indemnify Kinzel. They were not pertinent to the question of Century's duty to defend, which only requires the Polissos to show they had potential liability for property damage under the policy. Because there is no genuine dispute on that question, Century's claim of error fails.

### B. Duty to Pay for the Glass Under the Floater

Century also contends the genuine dispute doctrine mandates reversal of the bad faith judgment as it relates to the Installation Floater. It bases this contention on three theories: (1) the policy does not cover materials that have been permanently installed, (2) flood damage is an excluded cause, and (3) Charles did not have an insurable interest because he never paid for the glass. We shall address each theory separately.

---

'your work' except: . . . [w]ork that has not yet been completed or abandoned." Work is deemed completed when "all of the work called for in the contract has been completed . . . [however,] [w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

## 1. *Permanent Installation*

First Century argues it was reasonable for it to deny coverage based upon policy language providing that the coverage of the glass ceased when "building materials, equipment, supplies or fixtures have been installed and have become a permanent part of a building or structure . . . ."

The Polissos contend this claim has been waived because Century did not deny coverage on that basis, the trial court so found, and because Century does not challenge the trial court's ruling, it cannot go behind that ruling by raising it on appeal. They also argue the claim has no merit. We agree with the Polissos that the claim is without merit, but differ in our analysis.

In denying coverage under the floater, Century relied solely on policy language excluding damage caused by flooding and damages associated with defective materials or faulty workmanship. These grounds were stated in Century's letter to the Polissos denying coverage and in O'Hara's June 27, 1997, letter to Winkelman in which she explained the basis for denying coverage. Although O'Hara subsequently reversed her position with respect to Century's duty to defend, she did not alter her position with respect to coverage of the glass under the floater. Century did not assert any other grounds for denying coverage under the floater until it filed its opposition to the Polissos' motion for summary adjudication seeking a judicial determination the floater did not cover the glass. At that time, it claimed the glass had been installed when it was damaged and therefore was no longer covered.[16]

Assuming Century could have relied on this ground and that it would have become a genuine dispute, in fact no such dispute occurred. The question here is not a coverage question[17] but whether Century acted in bad faith when it failed to pay under the policy. As stated, the reasonableness of the insurer's decision to deny benefits must be evaluated as of the time the decision was made. (*Chateau, supra*, 90 Cal.App.4th at p. 347.) Since Century did not cite permanent installation as a ground for denial of coverage when the claim was tendered, it was never the subject of a genuine dispute between the parties.

---

[16] On appeal, Century asserts a different ground than it raised in its opposition to the Polissos' motion. When it argued that the policy covered property "that [is] to be installed by you . . ." and since the glass was already installed at the time it was damaged, it was no longer covered by the policy.

[17] By contrast, the denial of an insurance claim on one ground, absent clear and convincing evidence to suggest otherwise, does not impliedly waive grounds not stated in the denial letter. (*Waller, supra*, 11 Cal.4th at p. 31.) This principle is applied in insurance coverage cases, which are based on contract law, on the theory the insurer's failure to state a reason should not serve to create coverage for losses not covered in the policy in the absence of an intention to relinquish known rights. (*Id.* at pp. 31–34.)

Moreover, as a matter of law, the permanent installation exclusion is inapplicable. The trial court rejected this defense when it granted the Polissos' motion for summary adjudication. In so doing, it considered the policy language which states, "[w]e cease to insure your property at the earliest of the following . . . (2) when building materials, equipment, supplies or fixtures have been installed *and have become a permanent part of a building or structure* . . . ." According to the Polissos' statement of undisputed facts in support of their motion, the glass had not yet become a permanent part of the structure pending completion of the project and its acceptance by the Forest Service. Century did not dispute this fact in the trial court and does not challenge the trial court's ruling on appeal.

Accordingly, because the permanent installation language did not serve as the basis for a genuine dispute in fact or in law, we reject Century's claim of error.

### 2. *Flood Exclusion*

Next, Century contends under *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395 [257 Cal.Rptr. 292, 770 P.2d 704] (*Garvey*) and *Sabella v. Wisler* (1963) 59 Cal.2d 21 [27 Cal.Rptr. 689, 377 P.2d 889] (*Sabella*), that it reasonably relied on the flood exclusion to deny coverage because there was a genuine dispute as to whether the flood was the "efficient proximate cause" of the loss.

The Polissos contend Century's misapplication of the efficient proximate cause doctrine cannot create a genuine dispute. They argue the law on that subject was well settled at the time the claim was tendered and that based upon the facts known to Century, a reasonable insurer would have concluded the efficient proximate cause of the loss was third party negligence—a covered cause—not the flood. We agree with the Polissos.

*Garvey, supra,* 48 Cal.3d 395, clarified the law governing questions of coverage under the "all risk" section of a homeowners insurance policy when loss to the insured's property can be attributed to two causes, one which is an included peril and one that is an excluded peril. (*Id.* at p. 398.) The court found that the rule stated in *Sabella, supra,* 59 Cal.2d 21, "sets forth a workable rule of coverage . . . whenever there exists a causal or dependent relationship between covered and excluded perils." (*Garvey, supra,* 48 Cal.3d at p. 404.) The rule holds that where the efficient proximate cause is a covered loss, the fact an uncovered risk also contributed to the loss will not preclude coverage. (48 Cal.3d at pp. 402–403.) The court clarified that the term "efficient proximate cause" is the "predominating cause" rather than the "moving" or "triggering" cause. (*Id.* at p. 403.)

In *Garvey*, the insurance policy excluded coverage for "earth movement" and the homeowners sought to recover for losses resulting when an addition to the house begun to pull away from the main structure. The court held that the homeowners would be entitled to coverage if a jury determined the efficient proximate cause of the property damage was third party negligence rather than earth movement. (*Garvey, supra*, 48 Cal.3d at pp. 412–413.)

Here, the trial court determined the question of efficient proximate cause in its ruling granting the Polissos' motion for summary adjudication. Century did not dispute the Polissos' separate statement of undisputed facts in support of their motion and those facts established the following: After the glass panels were installed but before the project was completed, the chamber flooded during an unseasonably heavy rainstorm in the Lake Tahoe Basin. As a result, the chamber was submerged in water, which in turn caused various paints, resins, and other chemicals left in the chamber by other tradesmen to spill into the flood water, leaving a film on the glass. On January 24, 1997, Charles Polisso examined the glass and advised Allen's supervisor how to clean the glass, using Spray Away Glass Cleaner. Three days later, Charles observed Allen's caulking contractor use an improper tool to remove the caulking, severely scratching the glass. The glass was not scratched three days earlier.

In ruling on the Polissos' motion, the trial court found Century denied coverage under the flood exclusion despite the fact the damage to the glass panels occurred after the flooding. Applying the efficient proximate cause analysis in *Garvey, supra*, 48 Cal.3d 395, the trial court concluded "it is undisputed that acts by third parties actually caused the glass damage even if flooding may have precipitated the need for those acts. Consequently, the exclusion advocated by [Century] does not bar coverage."

Century does not challenge this ruling on appeal. Thus, there was no genuine dispute as to the relevant facts or the meaning and scope of the policy and the law on efficient proximate cause was not in question at the time the Polissos tendered their claim for coverage. We also agree with the trial court's legal conclusion under *Garvey*.

The glass was not damaged by the flood. It was damaged by subsequent acts involving third parties who in their efforts to remove the film, negligently scratched and gouged the glass. While the flood was the "but for" or precipitating cause of the damage, it was not the predominate or most important cause of the damage. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 754 [27 Cal.Rptr.3d 648, 110 P.3d 903] [efficient proximate cause is the predominate or most important cause].) We therefore conclude there was no genuine dispute between the parties on whether an excluded peril was the efficient proximate cause.

### 3. *Insurable Interest*

Third, and without citation to the record or to any legal authority, Century argues there was a legitimate dispute whether Charles had an insurable interest because he bought the glass on credit and never paid for it. The Polissos contend this claim has no merit because there was no genuine dispute over this issue at the time Century denied coverage since it was never asserted as a ground for denying coverage.

We find Century's failure to cite to the record or to any legal authority in support of this claim forfeits the claim. (Cal. Rules of Court, rule 14(a)(1)(B) and (C); *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743 [124 Cal.Rptr.2d 591] [failure to cite to the record waives the claim of error].)

We also find the claim is without merit. As the Polissos correctly assert, Century did not base its denial of coverage on this ground. The matter first appears in the record in the Polissos' motion in limine seeking to preclude Century from arguing that the Polissos were not entitled to policy proceedings under the floater. As stated, the reasonableness of the insurer's decision to deny benefits must be evaluated as of the time it was made. (*Chateau, supra*, 90 Cal.App.4th at p. 347.) Because Century did not assert this reason at the time it denied coverage, it was not the basis for reasonably denying benefits and therefore it cannot be the basis for a genuine dispute.

## III.

### Punitive Damages

Century raises three primary challenges to the punitive damage award, arguing there was instructional, evidentiary, and constitutional error. Before addressing Century's individual claims, we first set forth the pertinent general principles governing an award of punitive damages.

### A. *General Principles*

■ Civil Code section 3294, subdivision (a) authorizes an award of punitive damages "[i]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, . . . for the sake of example and by way of punishing the defendant."

Upon defendant's request, the trial court may bifurcate the trial and "preclude the admission of evidence of that defendant's profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294." (Civ. Code, § 3295, subd. (d).)

The substantive and procedural rules for determining the measure of a punitive damage award is a question of state law (*Haslip, supra,* 499 U.S. at p. 15 [113 L.Ed.2d at p. 18]; *Adams v. Murakami* (1991) 54 Cal.3d 105, 117 [284 Cal.Rptr. 318, 813 P.2d 1348]) and the states have considerable flexibility in determining the level of punitive damages they will allow. (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 568 [134 L.Ed.2d 809, 822, 116 S.Ct. 1589] (*BMW*).)

■ The United States Supreme Court has found that the traditional common law approach for determining punitive damage awards is not *per se* unconstitutional. (*Haslip, supra,* 499 U.S. at p. 17 [113 L.Ed.2d at p. 19].) The court in *Haslip* explained that under that approach, "the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable." (*Id.* at p. 15 [113 L.Ed.2d at p. 18].) An award of punitive damages violates due process only when the award is "grossly disproportionate" to the severity of the misconduct and lacks "some understandable relationship" to the compensatory damages. (*Id.* at p. 22 [113 L.Ed.2d at p. 22]; see *BMW, supra,* 517 U.S. at p. 568 [134 L.Ed.2d at p. 822].)

■ The high court in *BMW, supra,* 517 U.S. 559 [134 L.Ed.2d 809] and *State Farm Mut. Auto Ins. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*) refined the standard for judicial review of a due process challenge to a punitive damage award. Recognizing that "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition" (*BMW, supra,* 517 U.S. at p. 568 [134 L.Ed.2d at p. 822]), the court formulated three guideposts to assess whether a punitive award is grossly excessive in relation to those interests: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio between the punitive damage award and the actual or potential harm inflicted on the plaintiff, and (3) the difference between the punitive damage award and civil penalties authorized in comparable cases. (*Id.* at pp. 568, 574–575, 580, 583 [134 L.Ed.2d at pp. 822, 826, 829, 831].)

B. *Instructional Error*

Century contends the trial court improperly gave BAJI No. 14.72.2 on punitive damages rather than its proffered special instruction. In Century's view, that instruction violates the principles stated in *BMW* and *State Farm* because it fails to direct the jury to consider the third guidepost, comparable civil sanctions, while erroneously directing the jury to consider the defendant's financial condition to determine the amount of the award that will have a deterrent effect. We find no error.

In phase two of the trial, the court gave BAJI No. 14.72.2, which instructs the jury how to assess the measure of punitive damages. The jury was told to determine in its discretion whether and in what amount punitive damages should be imposed by way of example and for purposes of punishment, and to consider (1) the reprehensibility of Century's conduct, (2) the amount of punitive damages which will have a deterrent effect on Century in light of its financial condition, and (3) that the award must bear a reasonable relation to the injury, harm, or damage actually suffered by Century.[18]

According to the Supreme Court in *Haslip*, due process is satisfied as long as the jury's discretion is exercised within reasonable constraints. (*Haslip, supra*, 499 U.S. at p. 20 [113 L.Ed.2d at p. 21].) This standard is met where the instructions further the state's interests in retribution and deterrence and the jury is instructed that imposition of punitive damages is entirely discretionary, the purpose of punitive damages is to punish the defendant and deter the defendant and others from engaging in similar wrongs, and in determining the amount of the award, it must consider the character and degree of the wrong and the necessity of preventing similar wrongs. (499 U.S. at p. 19 [113 L.Ed.2d at p. 20–21].)

At least two courts have found that the standard BAJI instruction on punitive damages satisfies that standard. (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220 [1 Cal.Rptr.2d 301] (*Las*

---

[18] The court instructed the jury as follows: "having found malice, fraud or oppression, you must now determine whether you should award punitive damages against the Defendant, Century Surety Company, for the sake of example and by way of punishment. [¶] Whether punitive damages should be imposed, and if so the amount thereof, is left to your sound discretion, exercised without passion or prejudice. [¶] If you determine that punitive damages should be assessed against the Defendant, you are to consider the following at arriving at your award: [¶] 1, the reprehensibility of the conduct of the Defendant. [¶] 2, the amount of punitive damages which will have a deterrent effect on the Defendant in light of the defendant's financial condition. [¶] 3, that the punitive damages must bear a reasonable relation to the injury, harm, or damage actually suffered by the plaintiffs."

*Palmas*); *Boyle v. Lorimar Productions, Inc.* (9th Cir. 1994) 13 F.3d 1357.) In *Las Palmas, supra,* 235 Cal.App.3d 1220 at page 1257, the court concluded that BAJI No. 14.71 (7th ed. 1989 rev. mod.) provided the same degree of protection against arbitrary jury awards as did the instructions in *Haslip.* That instruction is given in a trial that is not bifurcated under Civil Code section 3295, subdivision (d) and includes the same language stated in BAJI No. 14.72.2, which was given to the jury in the present proceedings. Moreover, as the court found in *Boyle v. Lorimar Productions, Inc., supra,* 13 F.3d at page 1360, BAJI No. 14.71 goes beyond the Alabama instruction approved in *Haslip* because it expressly directs the jury to fashion an award that reflects the reprehensibility of the defendant's conduct, bears a reasonable relation to the actual harm, and will have a deterrent effect on the defendant. Because it contains the same language, the same may also be said of BAJI No. 14.72.2.

 Nevertheless, Century baldly asserts the instruction was prejudicially inadequate because it failed to tell the jury to consider the third *BMW/Campbell* guidepost, comparable sanctions. We disagree with Century because that guidepost was not intended to be a factor for the jury's consideration.

As part of its review of the punitive damage award, the court in *Haslip* examined Alabama's posttrial procedures for reviewing punitive damage awards, under which the Alabama Supreme Court conducted a comparative analysis of the existence of other civil awards for the same conduct. (*Haslip, supra,* 499 U.S. at pp. 21–22 [113 L.Ed.2d at pp. 21–22].)

The high court in *BMW* adopted that same factor as the third guidepost in conducting its own judicial review of a punitive award. (*BMW, supra,* 517 U.S. 559 [134 L.Ed.2d 809].) However, we do not find anything in *BMW* or *State Farm* to suggest that it was intended to be considered by the jury. To the contrary, that guidepost requires that a legal comparison be made between the punitive damage award and other civil sanctions. Because that comparison involves a question of law, it is beyond the province of the jury. As the court in *BMW* noted in connection with this guidepost, a "reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.' " (517 U.S. at p. 583 [134 L.Ed.2d at p. 831].)

By contrast, the first guidepost, which involves an assessment of the degree of reprehensibility, is determined by considering the presence or absence of a number of aggravating factors. (*State Farm, supra,* 538 U.S. at p. 419 [155 L.Ed.2d at p. 602].) Because those factors involve questions of fact that a jury is qualified to consider (Evid. Code, § 312), the standard jury instructions direct the jury to consider the degree of reprehensibility. (See BAJI Nos. 14.71 and 14.72.2.) We therefore conclude due process does not require the jury to consider the third guidepost in exercising its discretion.

Century also faults BAJI No. 14.72.6 because it directs the jury to consider the defendant's financial condition in order to determine the amount of punitive damages that will have a deterrent effect on the defendant. In Century's view, *BMW* and *State Farm* strongly suggest that the defendant's wealth should not be considered for this purpose. We disagree.

██ As noted, Civil Code section 3295, subdivision (d) requires that evidence of the defendant's financial condition be presented to the same trier of fact that found defendant guilty of malice, oppression, or fraud. The courts have long recognized that the defendant's financial condition is an essential factor in setting the amount of a punitive damage award that will be sufficient to serve the goals of retribution and deterrence without exceeding the necessary level of punishment. (*Adams v. Murakami, supra,* 54 Cal.3d at pp. 110–112.) This is because a punitive damage award " 'should not be a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes.' " (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1185 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*), quoting conc. opn. of Brown, J., in *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 427 [93 Cal.Rptr.2d 60, 993 P.2d 388].)

As the majority noted in *State Farm, supra,* 538 U.S. at pages 427 to 428 [155 L.Ed.2d at p. 607], where it quoted from the concurring opinion of Justice Breyer in *BMW,* " '[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy . . . . That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as "reprehensibility," to constrain significantly an award that purports to punish a defendant's conduct.' "

Thus, after reviewing *BMW* and *State Farm,* the California Supreme Court concluded that "the defendant's financial condition remains a legitimate consideration in setting punitive damages." (*Simon, supra,* 35 Cal.4th at p. 1185.) The court in *Simon* explained that "while wealth cannot substitute for the high court's guideposts in limiting awards, and cannot alone justify a high award, the guideposts were not intended 'to prevent juries from levying

awards that serve important state interests and provide a meaningful deterrent against corporate misconduct.' " (*Id.* at p. 1186, quoting *Kemp v. American Tel. & Tel. Co.* (11th Cir. 2004) 393 F.3d 1354, 1365.)

We conclude the jury was properly instructed to consider Century's net worth.

Nor do we agree with Century that the trial court erred by failing to give one of its proposed instructions. As discussed *ante*, both instructions improperly incorporated the third *BMW/State Farm* guidepost while omitting Century's financial condition. Because the instructions were incorrect statements of law, the trial court properly refused to give them. (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1242 [132 Cal.Rptr.2d 765].)

### C. *Evidentiary Error*

Century raises similar claims in the evidentiary context. It argues that the trial court erred by admitting evidence of its wealth to determine the minimum size of the punitive award and by excluding its proffered evidence in mitigation of the reprehensibility of its conduct and evidence of comparable penalties under the Insurance Code. These assertions are without any merit.

 For the reasons discussed *ante*, evidence of Century's net worth was properly admitted in the second phase of the trial. (Civ. Code, § 3295, subd. (d); *Simon, supra*, 35 Cal.4th at p. 1185.) Century argues however, that while such evidence was admissible to set a ceiling on punitive damage awards, it was not admissible to establish a floor on the award. We disagree.

A punitive damage award must be large enough to deter similar conduct without exceeding the amount necessary to punish the defendant. (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 928; *Adams v. Murakami, supra*, 54 Cal.3d at p. 112.) These two interests circumscribe the lower and upper limits of a permissible punitive award. The evidence was therefore properly admitted.

 Next, Century argues the trial court improperly excluded proffered evidence of comparable civil sanctions and evidence in mitigation of the reprehensibility gain. Again, because we have concluded that comparable civil sanctions are not a factor for the jury's consideration, such evidence is not relevant (Evid. Code, §§ 210, 350 [only relevant evidence is admissible]) and the trial court properly excluded that evidence.

As to the mitigation evidence, Century fails to identify the specific evidence it now claims was improperly excluded. Prior to beginning the second phase of the trial and at Century's request, counsel for the Polissos clarified that they did not intend to introduce evidence of other conduct in this stage because that issue had been resolved. Century, however, requested that it be allowed to introduce additional evidence on the issue of reprehensibility.[19] Counsel advised the court generally that it wanted to call Hess to explain that he did not testify during phase one because he was having knee surgery. Counsel also wanted to recall liability witnesses O'Hara and Costa to clear up the meaning of "tag teaming the claimant" in response to the Polissos' rebuttal in phase one of the trial. With respect to other issues on rebuttal, the proffer failed to specifically identify the testimony Century sought to elicit. The court denied the request on the ground those issues had been adjudicated.

On appeal, Century fails in part to identify what evidence it claims was erroneously excluded and fails to explain why that evidence was necessary and not duplicative of evidence previously admitted. As a general rule, evidence concerning the defendant's conduct is inadmissible in the punitive damage phase of a bifurcated trial. (*Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 949–950 [83 Cal.Rptr.2d 89].) However, even if we assume that in an appropriate case, the defendant is entitled to introduce evidence in phase two that is relevant to the degree of reprehensibility, Century does not give us anything to review.

We cannot rule on evidentiary claims in the abstract (*Haight v. Handweiler* (1988) 199 Cal.App.3d 85, 88, fn. 1 [244 Cal.Rptr. 488] [failure to specify the evidence waives the evidentiary claim of error]), and must presume the judgment is correct in the absence of an affirmative showing of prejudicial error. (Cal. Const., art. VI, § 13; *Taylor v. Varga* (1995) 37 Cal.App.4th 750, 759 [43 Cal.Rptr.2d 904].) Because Century failed to make an adequate offer of proof in the trial court, it cannot urge this evidentiary error on appeal. (*People v. Morrison* (2004) 34 Cal.4th 698, 711–712 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

Moreover, the trial court has discretion to exclude evidence that is prejudicial or necessitates undue consumption of time. (Evid. Code, § 352.) We find no abuse of that discretion. Here the trial court expressed concern as to whether Century wanted to relitigate the case anew, suggesting that it found the proffered evidence would have been cumulative, unnecessary, and/or time-

---

[19] In its reply brief, Century argues that the trial court was unwilling to allow it to make a proper offer of proof on the record. This assertion misrepresents the record. In fact, the trial court told counsel, "tell me what you want to do and I'll make a ruling. I don't know what you got in mind. I can't imagine calling Callie back here."

consuming. Indeed, Century wanted to present evidence to rehash issues that should have been resolved in phase one. Furthermore, because Century failed to identify much of the evidence with specificity, it is unable to establish that the trial court prejudicially abused its discretion. Accordingly, we reject its claim of error.

### D. *Closing Argument*

Century also baldly contends the trial court committed reversible error when it barred counsel from arguing how evidence adduced in the first phase of the trial should factor into the jury's determination of whether to award punitive damages and if so, in what amount. While Century asserts this error was prejudicial, it fails to make any argument showing why that is so. As stated, we cannot presume prejudice and will not reverse the judgment in the absence of an affirmative showing there was a miscarriage of justice. (Cal. Const., art. VI, § 13; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [87 Cal.Rptr.2d 754]; *Taylor v. Varga, supra,* 37 Cal.App.4th at p. 759.) Nor will this court act as counsel for appellant by furnishing a legal argument as to how the trial court's ruling was prejudicial. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 544–546 [35 Cal.Rptr.2d 574]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627.) Because Century has failed to establish prejudice, its claim of error fails.

### E. *The Award Was Not Constitutionally Excessive*

Last, Century contends the punitive damage award of $2,015,000 is constitutionally excessive under *BMW* and *State Farm.* It argues that its conduct was only minimally reprehensible, if at all, and that the ratio of the punitive damage award to the Polissos' actual damages and to comparable civil sanctions exceeds constitutional limits. We disagree.

In determining whether a jury's award of punitive damages is constitutionally excessive, we review the award de novo, independently assessing the guideposts set forth in *BMW* and *State Farm.* (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 435–436 [149 L.Ed.2d 674, 686–687, 121 S.Ct. 1678]; *Simon, supra,* 35 Cal.4th at p. 1172.) We give the ordinary measure of appellate deference to the jury's findings of historical fact, and where as here, the parties do not claim the findings are unsupported by substantial evidence, we accept those findings as the factual basis for our analysis. (*Simon, supra,* 35 Cal.4th at p. 1172.)

### 1. *Degree of Reprehensibility*

 The court in *BMW* characterized this guidepost as "the most important indicium of the reasonableness of a punitive damages award . . . ." (*BMW, supra,* 517 U.S. at p. 575 [134 L.Ed.2d at p. 826].) The relevant factors that bear on reprehensibility are whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard to the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. [Citation.] The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." (*State Farm, supra,* 538 U.S. at p. 419 [155 L.Ed.2d at p. 602].)

Here, Century's conduct caused both severe economic and emotional harm leading to physical symptoms. Century's bad faith denial of policy benefits impaired the Polissos' ability to manage their business, and contributed to the loss of their credit, their lease, much of their business, and their decision to file for bankruptcy. The jury found Century's breach of the implied covenant of good faith and fair dealing caused Therese and Charles "fears, anxiety or other emotional distress." That these symptoms were real and severe is evident from the jury's findings that the mental injuries warranted a noneconomic award of $200,000 to Therese and $100,000 to Charles. The undisputed evidence shows that Charles suffered heart palpitations, depression, panic attacks, and sleep loss and Therese also suffered heart palpitations, as well as loss of hair, and posttraumatic stress disorder.

 Century further argues that a cause of action based upon an insurer's breach of the implied covenant of good faith and fair dealing is an action for interference with property rights not for noneconomic damages.[20] (See *Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 129–130 [3 Cal.Rptr.2d 666, 822 P.2d 374]; *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 580 [108 Cal.Rptr. 480, 510 P.2d 1032].) Century ignores the nature of a bad faith cause of action against an insurer. Although it is based upon a contract, it sounds in tort, and damages for emotional distress are recoverable. (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 551 [87 Cal.Rptr.2d 886, 981 P.2d 978]; *Gourley, supra,* 53 Cal.3d at pp. 129–130; *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 433–434 [58 Cal.Rptr. 13, 426 P.2d 173].)

---

[20] This is an odd argument given Century's failure to challenge the jury's compensatory damage award of $300,000 for emotional distress.

As to the next factor, Century argues that its conduct does not evince an indifference to the Polissos' health and safety. While we agree the evidence does not show an indifference to their safety, there is substantial evidence to show Century acted with reckless indifference to their health and peace of mind. Century knew by December 1997 that the Polissos did not have the funds to properly litigate their federal claim and Farmer repeatedly informed Century of the Polissos' financial vulnerability. In fact, Century exploited that knowledge for five years in order to force the Polissos to dismiss their affirmative counter-claims against it and allow Century to take over their defense in *Allen*. Indeed, O'Hara admitted filing the declaratory relief action as a scare tactic.

Century concedes its conduct was intentional and malicious rather than mere accident and that the Polissos were financially vulnerable.[21] It argues, however, that its conduct was limited to an isolated incident. We disagree.

While there was no evidence Century engaged in such tactics with other individuals, its conduct with respect to the Polissos was hardly limited to a single event. Century engaged in a course of conduct over a five-year period of time that was designed to avoid paying the insurance benefits covered by the policy. By September 1997, Century recognized it had a duty to defend the Polissos, but nevertheless only agreed to provide a defense under a full reservation of rights, refused to provide them with independent counsel and when it finally agreed to pay Farmer as independent counsel it did so subject to a reservation of rights, and then dragged its feet in making payment, forcing Farmer to chase after it and eventually file suit to recover a substantial portion of his fees.

In sum, while Century knew it had a duty to defend the Polissos, it took every opportunity to stall, stonewall, engage in scare tactics, and then refused to pay Farmer in full or in a timely manner. It did this so Farmer would withdraw from the *Allen* action, leaving the Polissos' defense in Century's hands so it could deny coverage rather than defend them. Under these circumstances, we conclude Century's conduct rates moderately high on the reprehensibility scale.

### 2. *Ratio of Punitive Damages to Actual Harm*

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." (*BMW, supra*, 517 U.S. at p. 580 [134 L.Ed.2d

---

[21] The evidence clearly shows Kinzel was a family owned business and that the Polissos had limited resources, which were woefully insufficient to absorb the damages resulting from the Tahoe job or to engage in protracted litigation.

at p. 829].) This component is based on the long-standing principle that "exemplary damages must bear a 'reasonable relationship' to compensatory damages." (*Ibid.*) Although the court has avoided drawing "a mathematical bright line" in determining an excessive ratio, it has nevertheless observed that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm, supra,* 538 U.S. at p. 425 [155 L.Ed.2d at pp. 605–606].) Nevertheless, the court found "instructive," cases approving a ratio of three or four to one. (*State Farm, supra,* 538 U.S. at p. 425 [155 L.Ed.2d at p. 606].) It cautioned however, that while a higher ratio may be justified where " 'a particularly egregious act has resulted in only a small amount of economic damages,' " a lower ratio as low as one-to-one may be justified when "compensatory damages are substantial . . . ." (*State Farm, supra,* 538 U.S. at p. 425 [155 L.Ed.2d at p. 606].) Having approved such ratios, the high court has thrown out punitive damage awards only where it found "breathtaking" ratios of 500 to 1 (*BMW, supra,* 517 U.S. at p. 583 [34 L.Ed.2d at p. 831]) and 145 to 1. (*State Farm, supra,* 538 U.S. at p. 426 [155 L.Ed.2d at p. 606].)

The Polissos were awarded $622,911 in compensatory tort damages[22] and $2,015,000 in punitive damages, a ratio of 3.2 to 1, which is well within the constitutional limit. Although the compensatory damages were substantial, this ratio is warranted given the reprehensibility of Century's conduct.

Century also baldly asserts there is a significant overlap between the compensatory damages and the punitive damages but fails to state the nature of the overlap. In *State Farm,* the court found such an overlap where the compensatory damages were based on the plaintiff's distress caused by the outrage and humiliation he suffered at the hands of the insurer because "a major role of punitive damages [is] to condemn such conduct." (*State Farm, supra,* 538 U.S. at p. 426 [155 L.Ed.2d at p. 606].)

Unlike in *State Farm,* the compensatory damages here do not include compensation for outrage and humiliation. While they include a substantial award for noneconomic damages for fear, anxiety, and emotional distress, in closing argument, counsel for both parties made clear the purpose of the punitive damage award was to fine Century for its reprehensible conduct and warned the jury not to duplicate an amount awarded as part of the compensatory damages.[23] We therefore reject Century's unsupported assertion that the punitive damage award is duplicative of the compensatory damage award.

---

[22] Century argues that the ratio must not be based on a total that includes contract damages and asserts that the tort damages are only $435,186, making the ratio nearly five to one. Century ignores the record. Moreover, the jury awarded the Polissos an additional $15,000 in contract damages, we did not include that amount in our calculus.

[23] Century's counsel told the jury that in assessing the amount of punitive damages, if the compensatory damage award included some amount of punishment, it should not punish

### 3. *Comparable Civil Sanctions*

"The third guidepost in [*BMW*] is the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.' " (*State Farm, supra,* 538 U.S. at p. 428 [155 L.Ed.2d at pp. 607–608].) As a comparable civil sanction, Century relies on Insurance Code section 790.035, which imposes a maximum fine of $10,000 for each willful act of misconduct by an insurance company. This provision is not particularly useful where as here Century engaged in a course of conduct over a five year period that involved many prohibited acts, although no findings were made as to the exact number of those acts.

The analytical framework set forth in *BMW* and *State Farm* involves the application and interplay of three "guideposts" rather than three fixed elements. (*Simon, supra,* 35 Cal.4th at p. 1186.) To serve the goals of punishment and deterrence, "a punitive damages award must send a message to the offender and others in similar positions that this sort of behavior will not be tolerated." (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 26 [14 Cal.Rptr.3d 89].) To send that message, the award must be large enough to deter similar future conduct without exceeding the amount necessary for punishment. Consideration of the defendant's net worth enables the jury to strike that balance. (*Simon, supra,* 35 Cal.4th at p. 1185.)

The parties stipulated that Century's net worth was $56,921,567, making the punitive award only 3.2 percent of Century's net worth. A smaller award would not amount to much more than a slap on the wrist. (*Bardis v. Oates, supra,* 119 Cal.App.4th at pp. 26–27 [concluding that an award that is 1 percent of the defendant's net worth is tantamount to a slap on the wrist].) We have found Century engaged in misconduct over an extended period of time that was moderately high on the reprehensibility scale while the punitive damage award is less than four times the amount of the compensatory damage award. We therefore find the award reasonably achieves the state's interests in retribution and deterrence without being grossly excessive.

---

Century twice by including that amount in its punitive award. Counsel for the Polissos argued that the compensatory damage award did not include a punishment component and that the jury's task in the punitive damage phase was to determine whether to impose a civil fine on Century for the conduct it found to be oppressive, malicious or fraudulent, and if so the amount of the fine.

## DISPOSITION

The judgment is affirmed. The Polissos are awarded their costs on appeal. (Cal. Rules of Court, rule 27(a)(1).)

Sims, J., and Robie, J., concurred.

A petition for a rehearing was denied June 16, 2006, and the opinion was modified to read as printed above.