Filed 11/4/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MOUNTAIN VIEW POLICE DEPARTMENT,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRENDAN KREPCHIN,<br><br>    Defendant and Appellant. | H050872<br>(Santa Clara County<br>Super. Ct. No. 21GV000069) |

On November 5, 2021, officers from the Mountain View Police Department (police department) investigated a reported armed robbery at defendant Brendan Krepchin's apartment in Mountain View.  The officers quickly suspected there had not actually been an armed robbery and, upon further investigation, observed evidence that prompted the police department to petition the Santa Clara County Superior Court for a gun violence restraining order against Krepchin.  The court issued an initial emergency restraining order later that day.  Following a noticed hearing in January 2023, the court issued a three-year gun violence restraining order pursuant to Penal Code section 18175, during which time Krepchin is barred from possessing a firearm or ammunition.

Krepchin argues the gun violence restraining order violates the Second Amendment to the United States Constitution because the police department failed to show that the provisions in the order are consistent with similar historical regulations in place during the country's founding era, pursuant to the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1

(*Bruen*).  He also argues that the restraining order was procedurally defective; that the trial court abused its discretion by qualifying an investigating officer as a threat assessment expert, and by admitting hearsay evidence at the hearing; and that the gun violence restraining order was not supported by substantial evidence.

Finding no constitutional infirmity or trial court error, we affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Report of armed robbery and initial police response*

Shortly after 1:00 a.m. on November 5, 2021, Krepchin called the police department to report an armed robbery at his apartment, where he lived alone.  Three police officers and a police dog soon arrived at the multi-level apartment complex that included Krepchin's apartment.  The officers initially located Krepchin in a common hallway of the apartment building.  After entering his apartment and inspecting the premises, they determined no one was inside.

At that point, the officers proceeded to interview Krepchin and canvass the area for physical evidence related to the reported incident.  Krepchin told the officers that he had heard his car alarm go off and had gone downstairs to investigate.  When he returned upstairs to his apartment, Krepchin said, he was confronted by a suspect with a semi-automatic handgun who pushed him to the ground and fled.  Krepchin also told the officers that $3,000 had been stolen from a small safe in his hallway closet.

The officers did not identify any evidence of forced entry or armed robbery. Nothing in Krepchin's apartment appeared disturbed.  Officers also attempted to trigger Krepchin's car alarm, but could not cause it to activate.  As a result, they became skeptical of Krepchin's account and believed there had been no armed robbery.

In addition, while searching Krepchin's apartment, Officer Travis Herbek observed a handwritten note in plain view on a bookshelf, which he believed related to a planned or considered act of violence.  The note included five short columns of information.  Under one heading labeled "Options," it listed:  "1. Lure with Fake Profile

2

[¶] 2. Hire Pro [¶] 3. Stalk [¶] 4 Drugs." Under another heading labeled "Flow," it listed: "Lure [¶] Action [¶] Dispose." A column with no header listed three locations as: "Work – Pacifica [¶] Home – San Mateo [¶] Alt. – Morgan Hill." Another column with a header labeled "Scope" listed: "1. work place [¶] 2. Places in PCF [¶] 3. Spot on Hill [¶] 4. Sugar loaf," with stars next to the first three listings. Under a heading labeled "Phone" appeared the words "Tracks Location" and "Dispose." Finally, the note included three separately underlined phrases or words: "Night Op," "Security Probs," and "Car."[1]

Inside Krepchin's apartment, Herbek also observed law enforcement equipment, military memorabilia and "similar items." In Krepchin's car—a Dodge Charger, a common type of law enforcement vehicle—Herbek saw law enforcement equipment, as well as a computer mount where a patrol officer would place a computer, and a badge holder. Inside Krepchin's bedroom, Herbek also saw an open safe with a portion of a semi-automatic rifle inside.

Based on these observations, the officers called in Jason Roldan, a detective in the police department's crimes against persons unit, to investigate further. Roldan arrived later that same day and examined Krepchin's apartment. After speaking with the initial investigating officers and reviewing their reports, Roldan contacted Krepchin's former employers, including an ambulance company where Krepchin worked as an EMT. Krepchin's supervisor stated that Krepchin's work ethic had begun to decline around the time he had broken up with his girlfriend. The supervisor also reported that Krepchin began missing workdays and his appearance and grooming standards had suffered, resulting in disciplinary action. Krepchin soon left the ambulance company.

---

[1] Krepchin later told his evaluating physician, who testified at trial and submitted his report into evidence, that he (Krepchin) did not recall writing the note. Krepchin acknowledged that it looked like his handwriting, but he did not know whether he wrote it or how it was in his apartment. Krepchin had no explanation as to why the note was there or what it was referring to.

Krepchin's supervisor also reported that a manager of the company lived in Pacifica, and he believed the other cities listed on the note found in Krepchin's apartment—San Mateo and Morgan Hill—were related to Krepchin's ex-girlfriend.

The supervisor then referred Roldan to another of Krepchin's co-workers, who had expressed concerns that Krepchin would carry out a violent attack, and who had heard Krepchin had a "hit list."

Roldan then interviewed Krepchin, who stated that he was in possession of multiple firearms registered to him.

### B. Gun violence emergency protective order

Based on this evidence, the police department sought an emergency gun violence protective order that same day. Roldan signed the application on behalf of the department, in which he set forth his reasonable cause to support issuance of the order: "On 11/5/21 at approximately 0118 hours, Brendan Krepchin called 911 that a man with a gun had just left his apartment. A K-9 and several officers searched for the gunman but was not located. Krepchin said a man with a gun was in his bathroom. The suspect pushed Krepchin causing him to fall and his hit head. Officers searched his apartment and did not find any signs of a struggle. During the search, officers found a suspicious note which appeared to be an operational plan for workplace violence. Officers discovered that Krepchin is an EMT for Santa Clara County AMR and is currently on administrative leave. Krepchin's prior supervisor mentioned he recently broke up with a girlfriend who was a supervisor's daughter. The suspicious note listed the cities in which a regional director and his girlfriend had lived in. The note also listed ways to lure a victim such as stalking, creating a fake profile, or drugging them. Krepchin has multiple firearms registered to him. He also owns a Dodge which resembles a police vehicle. A previous [police department] report mentioned that Krepchin takes medication for anger issues."

The court issued the emergency gun violence restraining order at 4:21 p.m. on November 5, 2021 (emergency order). It required Krepchin to surrender all firearms,

ammunition and magazines that he owned or possessed, in accordance with Penal Code section 18120.[2]  It also informed Krepchin that a more permanent gun violence restraining order may be obtained against him.  Roldan personally served the emergency order on Krepchin at the police department on November 9, 2021.  The emergency order provided that it would last until November 26, 2021, and that a hearing on a more permanent restraining order would be held on November 22, 2021.

### C.  Subsequent investigation and evidence

After serving the emergency order on Krepchin, Roldan continued his investigation.  He retrieved four of Krepchin's firearms from Krepchin's mother's residence, including an AR-15 rifle, as well as additional firearms from the safe in Krepchin's apartment.

Herbek undertook what he characterized as a "behavioral threat assessment" or "risk assessment" of Krepchin.  He researched Krepchin's history of violence, including police department records, and identified two prior incidents of concern.  The first incident occurred in 2009 during a parent-teacher conference when Krepchin was in middle school.  Krepchin reportedly made threats to kill teachers and his parents, and the teacher—who had 10 years of experience with emotionally disturbed children—informed the investigating officer at the time that Krepchin was the first child she believed capable of carrying out the threat.  The report also stated that Krepchin had been receiving mental health treatment.

In the second incident, a neighbor had called the police in 2021 to report sounds of wailing and "an emotionally charged person" inside Krepchin's apartment.  The resulting police report noted that Krepchin had referred to struggling with anger issues and taking psychiatric medications.

---

[2] Undesignated statutory references are to the Penal Code.

Based on all the evidence gathered before and after issuance of the emergency order, Herbek believed Krepchin posed a high threat of violence to the community.

### D. Hearing and issuance of gun violence restraining order

The hearing was ultimately held on January 26, 2023. Herbek was qualified as a threat assessment expert over Krepchin's objection, and Herbek and Roldan testified on behalf of the police department to the facts summarized above. Krepchin did not testify, and instead called his mother and Dr. John Greene as witnesses, the latter of whom was qualified as an expert in general psychiatry and who testified about the psychological evaluation he performed on Krepchin. Greene opined that Krepchin did not suffer from mental illness or behavioral and emotional regulation issues that would lead him to be at risk of harming himself or other people. He testified that he did not consider the note found in Krepchin's apartment to be significant because the words were "not connected to each other and do not amount to any specific coherent thoughts that could be regarded as a threat."

Following the testimony, the trial court granted the gun violence restraining order for a period of three years (GVRO), as the police department had requested. The court found that the police department had shown "by clear and convincing evidence, that Mr. Krepchin poses a significant danger now or in the future of causing personal injury to himself or to others by having a firearm and that a restraining order is necessary to [prevent] that danger." The court placed great emphasis on the note found in Krepchin's apartment and the fact that Krepchin had been unable to provide any explanation for it.

The GVRO was issued and filed that day. It prohibits Krepchin from possessing, owning, purchasing or receiving all firearms, ammunition and magazines, and ordered him to surrender any in his custody. The GVRO will expire on January 26, 2026.

Krepchin timely appealed. After the filing of Krepchin's reply brief, we requested supplemental briefing regarding *United States v. Rahimi* (2024) 602 U.S. __ [144 S.Ct. 1889] (*Rahimi*), and its potential application to this appeal.

6

## II. DISCUSSION

Krepchin makes five general arguments on appeal: (1) the GVRO provisions violate the Second Amendment to the United States Constitution; (2) the GVRO was procedurally defective, requiring remand to the trial court; (3) the trial court erred by qualifying Herbek as a threat assessment expert; (4) the trial court erred by admitting hearsay evidence at the hearing; and (5) the trial court's decision to issue the GVRO was not supported by substantial evidence.

### A. Second Amendment

Preliminarily, we must determine whether Krepchin's Second Amendment challenge is facial or as-applied, and whether it is properly before this court.

A facial challenge addresses only the text of a particular statute itself, "not its application to the particular circumstances of an individual." (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474 (*Alexander*).) It asserts that the statute cannot have any valid application, and it requires the review of only abstract and generalized legal concepts, rather than any particular facts in the record. (*People v. Patton* (2019) 41 Cal.App.5th 934, 946 (*Patton*), citing *People v. Pirali* (2013) 217 Cal.App.4th 1341, 1347.)

By contrast, an as-applied challenge seeks relief from a specific application of a facially valid statute to an individual and requires the reviewing court to examine factual findings in the record. (*In re D.L.* (2023) 93 Cal.App.5th 144, 157; *In re Sheena K.* (2007) 40 Cal.4th 875, 887.)

Krepchin characterizes his challenge as both facial and as-applied. In his opening brief, he asserts that "the gun violence restraining order provisions here violate the second amendment." Similarly, he argues that his Second Amendment right was violated when the court ordered the GVRO against him. In his reply brief, he contends that his "basis for objection was not ripe until the [trial court judge] issued a written GVRO that

clearly violated the Second Amendment." In supplemental briefing, though, Krepchin argues that section 18175 is unconstitutional both on its face, and as applied.

Notwithstanding Krepchin's own characterizations, we construe his challenge as a facial challenge to section 18175. Despite the phrasing used in his briefs, Krepchin does not actually present any argument regarding the particular circumstances of the GVRO or the statute as applied to him. Instead, he argues only that the mere issuance of a gun violence restraining order that prevents him from possessing a firearm necessarily violates the Second Amendment—an argument that amounts to a facial challenge to the statutes that authorize such orders. (See, e.g., *Zachary H. v. Teri A.* (2023) 96 Cal.App.5th 1136, 1143–1144 (*Zachary H.*) [court construed challenge to be partially as-applied because appellant "assert[ed] the need for an exception to the firearms restriction based on a purported individualized need for self-protection and her desire to attend [gun meetings]".)[3]

### 1. *Applicable law and standard of review*

#### (a) *Gun violence restraining order statutes*

Gun violence restraining orders in California, including the GVRO issued here, are governed by section 18100, et seq. That section provides: "A gun violence restraining order is an order, in writing, signed by the court, prohibiting and enjoining a named person from having in his or her custody or control, owning, purchasing, possessing, or receiving any firearms or ammunition. This division establishes a civil restraining order process to accomplish that purpose." (§ 18100.)

---

[3] Accordingly, we need not address the parties' arguments regarding whether Krepchin forfeited his right to bring his Second Amendment challenge by failing to raise it in the trial court. (See, e.g., *Patton, supra,* 41 Cal.App.5th at p. 946 [appellant forfeits as-applied challenge by not raising it in the trial court]; *Zachary H., supra,* 96 Cal.App.5th at pp. 1143–1144 [forfeiture rule does not extend to facial challenges presenting pure questions of law].)

The gun violence restraining order statutes provide for three different types of restraining orders "prohibiting a person from owning or possessing a firearm, ammunition, or magazine: (1) a 21-day temporary emergency GVRO issued ex parte on request of a law enforcement officer if the court finds 'reasonable cause to believe' the subject 'poses an immediate and present danger' of gun violence (§ 18125); (2) a 21-day ex parte GVRO issued on request of a family member, employer, coworker, teacher, or law enforcement officer if the court finds a 'substantial likelihood' that the respondent 'poses a significant danger, in the near future' of gun violence (§ 18150, 18155); and (3) a one-to-five-year GVRO issued after notice and hearing if the court finds 'by clear and convincing evidence' that there is a 'significant danger' of gun violence (§ 18175)." (*San Diego Police Department v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 565 (*Geoffrey S.*).)

For the third category of restraining order, which is at issue here, the petitioner expressly bears the burden of proving at a hearing, by clear and convincing evidence, that: "(1) The subject of the petition, or a person subject to a temporary emergency gun violence restraining order or an ex parte gun violence restraining order, as applicable, poses a significant danger of causing personal injury to themselves or another by having in the subject's or person's custody or control, owning, purchasing, possessing, or receiving a firearm, ammunition, or magazine[; and] (2) A gun violence restraining order is necessary to prevent personal injury to the subject of the petition, or the person subject to an ex parte gun violence restraining order, as applicable, or another because less restrictive alternatives either have been tried and found to be ineffective, or are inadequate or inappropriate for the circumstances of the subject of the petition, or the person subject to an ex parte gun violence restraining order, as applicable." (§ 18175, subd. (b).)

Section 18175 also sets forth the scope of evidence a court may consider when deciding whether to issue a one-to-five-year restraining order: "In determining whether to issue a gun violence restraining order [after notice and hearing], the court *shall*

9

*consider evidence* of the facts identified in [section 18155, subd. (b)(1)] *and may consider any other evidence of an increased risk for violence*, including, but not limited to, evidence of the facts identified in [section 18155, subd. (b)(2)]." (§ 18175, subd. (a).) (*Geoffrey S., supra,* 86 Cal.App.5th at p. 567.)

The first of those referenced sections—section 18155, subdivision (b)(1)—lists the following types of evidence that a court *shall* consider in determining whether grounds for a restraining order exist: "(A) A recent threat of violence or act of violence by the subject of the petition directed toward another. [¶] (B) A recent threat of violence or act of violence by the subject of the petition directed toward themselves. [¶] (C) A violation of an emergency protective order issued pursuant to [Section 646.91 of the Family Code] that is in effect at the time the court is considering the petition. [¶] (D) A recent violation of an unexpired protective order issued pursuant to [various statutes]. [¶] (E) A conviction for any offense listed in Section 29805. [¶] (F) A pattern of violent acts or violent threats within the past 12 months, including, but not limited to, threats of violence or acts of violence by the subject of the petition directed toward themselves or another." (§ 18155, subd. (b)(1).)

The second referenced section—section 18155, subdivision (b)(2)—lists the following types of evidence that a court *may* consider: "(A) The unlawful and reckless use, display, or brandishing of a firearm by the subject of the petition. [¶] (B) The history of use, attempted use, or threatened use of physical force by the subject of the petition against another person. [¶] (C) A prior arrest of the subject of the petition for a felony offense. [¶] (D) A history of a violation by the subject of the petition of an emergency protective order issued pursuant to [Section 646.91 of the Family Code]. [¶] (E) A history of a violation by the subject of the petition of a protective order issued pursuant to [various statutes]. [¶] (F) Documentary evidence, including, but not limited to, police reports and records of convictions, of either recent criminal offenses by the subject of the petition that involve controlled substances or alcohol or ongoing abuse of controlled

10

substances or alcohol by the subject of the petition. [¶] (G) Evidence of recent acquisition of firearms, ammunition, or other deadly weapons. [¶] (H) Evidence of acquisition of body armor, as defined in Section 16288."

### *(b) Second Amendment*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

Several recent decisions from the United States Supreme Court have addressed the extent to which certain laws or regulations restricting possession of firearms have violated the Second Amendment.

In *District of Columbia v. Heller* (2008) 554 U.S. 570, (*Heller*), the Court held that the Second Amendment codifies a pre-existing right that is exercised individually and belongs to all Americans. (*Heller*, at pp. 592, 581.) It protects the "right to possess and carry weapons in case of confrontation," and "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." (*Id*. at pp. 592, 635.) Based on that interpretation, the Court invalidated a District of Columbia law that prohibited the possession of usable handguns in the home. (*Id*. at p. 635 ["Assuming that [Heller] is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home"]; *see also, McDonald v. City of Chicago* (2010) 561 U.S. 742 (*McDonald*) [applying Second Amendment to the states through Due Process Clause of Fourteenth Amendment].)

In *McDonald*, the Court noted that the rights protected by the Second Amendment are not unlimited, and that its holding in *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the

commercial sale of arms.' " (*McDonald, supra,* 561 U.S. at p. 786, quoting *Heller, supra*, 554 U.S. at pp. 626–627.)

In *Bruen*, the Court held that the Second Amendment protects an individual's right to carry a handgun for self-defense outside the home. Therefore, a New York State law violated the Second Amendment by requiring an applicant for a public-carry license to demonstrate a special need for self-defense. (*Bruen, supra,* 597 U.S. at p. 11 ["[t]he government further conditions issuance of a license to carry on a citizen's showing of some additional special need. Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution."].)

The Court emphasized, though, that "nothing in our analysis should be interpreted to suggest the unconstitutionality of ... licensing regimes" that "require applicants to undergo a background check or pass a firearms safety course," as these "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' " (*Bruen, supra*, 597 U.S. at p. 38, fn. 9.)

The Court also articulated the standard for evaluating whether a firearm regulation violates the Second Amendment: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen, supra*, 597 U.S. at p. 17, quoting *Konigsberg v. State Bar of California* (1961) 366 U.S. 36, 50, fn. 10.)

"Determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are

'relevantly similar.' " (*Bruen, supra,* 597 U.S. at pp. 28–29.) To make that determination, a court considers whether " 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." (*Id*. at p. 27.) To satisfy this requirement, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (*Id*. at p. 30.)

Most recently in *Rahimi*, the Court considered the constitutionality of a federal statute—18 U.S.C. §922(g)(8)—that prohibits individuals subject to a domestic violence restraining order from possessing a firearm if the restraining order includes a finding that the individual "represent[ed] a credible threat to the physical safety of [an] intimate partner" or a child thereof. (*Rahimi, supra,* 144 S.Ct. at p. 1894.) The Court held that, "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect. Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms. As applied to the facts of this case, [the federal statute] fits comfortably within this tradition." (*Id*. at pp. 1896–1897].)

The Court traced the nation's history and tradition of firearm regulations, concluding that, "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." (*Rahimi, supra,* 144 S.Ct. at p. 1899.) "Taken together," the court stated, "the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." (*Id*. at p. 1901.)

13

The Court acknowledged that while the federal statute at issue was "by no means identical to these founding era regimes," it did not need to be. (*Rahimi, supra,* 144 S.Ct. at p. 1901.) Instead, "[i]ts prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." (*Ibid.*) Like the historical laws the Court summarized, the federal statute in *Rahimi* applies to individuals found to threaten the physical safety of another; restricts gun use to mitigate demonstrated threats of physical violence; does not broadly restrict arms use by the public generally; involves judicial determinations of whether a particular defendant would likely threaten or had threatened another with a weapon; imposes restrictions of limited duration; and imposes an even less-restrictive penalty than the historic laws, which provided for imprisonment. (*Id*. at pp. 1901–1902].)

In short, "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." (*Id*. at p. 1903.)

Within this framework, our review of Krepchin's facial challenge to the constitutionality of section 18175 is de novo.[4] (*Alexander, supra,* 91 Cal.App.5th at p. 474.)

### 2. Analysis

Applying the standards set forth above, we conclude that section 18175 does not violate the Second Amendment.

As a threshold matter, the Second Amendment's plain text covers Krepchin's conduct here. (*Bruen, supra,* 597 U.S. at p. 17.) In *Rahimi*, the Court presumed "that Rahimi was protected by the Second Amendment even though he had committed 'family

---

[4] There does not appear to be any existing authority addressing whether Penal Code section 18175—enacted in 2014 and amended to its current form in 2019—violates the Second Amendment, and the parties have not identified any. (Stats. 2014, ch. 872; Assem. Bill No. 1014 (2023–2014 Reg. Sess.), § 3; Stats. 2019, ch. 733; Assem. Bill No. 1493 (2019–2020 Reg. Sess.), § 2.2.)

violence.' " (*United States v. Diaz* (5th Cir. 2024) 116 F.4th 458, 466 (*Diaz*), quoting *Rahimi, supra,* 144 S.Ct. at p. 1895; see also *Id.* at p. 1907], Gorsuch, J., concurring ["In this case, no one questions that the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment"].) "As in *Rahimi*, the 'two-step' view of *Bruen* is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation." (*Diaz, supra*, 116 F.4th at p. 467; citing *Rahimi*, *supra,* 144 S.Ct. at p. 1889.)

Accordingly, we proceed to assess whether section 18175 is consistent with the nation's historical tradition of firearm regulation. (*Bruen, supra*, 597 U.S. at p. 17.) Although section 18175 is not identical to the federal statute at issue in *Rahimi*, they are sufficiently similar, such that we find the United States Supreme Court's analysis in that case applicable and controlling.

The statute upheld in *Rahimi* prohibits an individual subject to a domestic violence restraining order from possessing a firearm if the order includes a finding that the individual "represent[ed] a credible threat to the physical safety of [an] intimate partner" or a child thereof. (*Rahimi, supra,* 144 S.Ct. at p. 1894]; 18 U.S.C. § 922(g)(8)(C)(i).) Section 18175 similarly authorizes a gun violence restraining order if the court finds that an individual poses a "significant danger of causing personal injury to themselves or another" by possessing, controlling, owning, purchasing, or receiving a firearm, ammunition or magazine. (§ 18175, subd. (b)(1), (2).) California's statute also imposes a heightened evidentiary requirement that the court make such a finding by "clear and convincing evidence." (§ 18175.)

In assessing whether the federal statute is consistent with the nation's historical tradition of firearm regulation, the United States Supreme Court explained that historic firearm regulations have "included provisions barring people from misusing weapons to harm or menace others," and that "[w]hen an individual poses a clear threat of physical

15

violence to another, the threatening individual may be disarmed." (*Rahimi*, 144 S.Ct. at p. 1899].)

Like the historical laws the Court summarized in *Rahimi*, and like the federal statute at issue in that case, section 18175 applies to individuals found to threaten the physical safety of others, and restricts gun use to mitigate demonstrated threats of physical violence: "the petitioner has the burden of proving, by clear and convincing evidence, that … [¶] the subject of the petition, or a person subject to a temporary emergency gun violence restraining order or an ex parte gun violence restraining order, as applicable, poses a significant danger of causing personal injury to themselves or another by having in the subject's or person's custody or control, owning, purchasing, possessing, or receiving a firearm, ammunition, or magazine." (§ 18175, subd. (b)(1); *Rahimi,* 144 S.Ct. at pp. 1899–1901.)

Similarly, section 18175 does not broadly restrict arms use by the public generally, but instead targets only specified individuals found to threaten the physical safety of others. (*Rahimi,* 144 S.Ct. at p. 1901].)

Additionally, section 18175 involves judicial determinations of whether a particular defendant would likely threaten or had threatened others with a weapon: "If the court finds that there is clear and convincing evidence to issue a gun violence restraining order, the court shall issue a gun violence restraining order that prohibits the subject of the petition from having in the subject's custody or control, owning, purchasing, possessing, or receiving, or attempting to purchase or receive, a firearm, ammunition, or magazine." (§ 18175, subd. (c)(1); *Rahimi,* 144 S.Ct. at pp. 1901–1902.)

And, the restrictions imposed by section 18175 are of limited duration—between one and five years—and therefore less-restrictive than the historical laws that provided for imprisonment: "The court shall issue a gun violence restraining order under this chapter for a period of time of one to five years, subject to termination by further order of

16

the court at a hearing held pursuant to Section 18185 and renewal by further order of the court pursuant to Section 18190." (§ 18175, subd. (e)(1); *Rahimi,* 144 S.Ct. at p. 1902].)

The legislative history of section 18175, as well as analogous statutes and case law, support the conclusion that the statute is consistent with our nation's history of firearm regulations. For instance, the committee reports reflect that California's gun violence restraining order statutes were "modeled on our state's domestic violence restraining order laws." (Sen. Com. on Public Safety, conc. of Assem. Bill No. 1014 (2013–2014 Reg. Sess.) Aug. 29, 2014, p. 7.) Those laws—the Domestic Violence Protection Act—authorize a court to issue a protective order " ' "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved," upon "reasonable proof of a past act or acts of abuse." ' " (*In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 225; citing *Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782.) Family Code section 6389 prohibits an individual subject to a domestic violence restraining order from possessing a firearm or ammunition. (Fam. Code, § 6389; *Zachary H., supra,* 96 Cal.App.5th at p. 1144.)

Family Code section 6389 has also been upheld against Second Amendment challenges. In *Altafulla v. Ervin* (2015) 238 Cal.App.4th 571, the court held that the statute is "analogous to a prohibition on felon weapon possession," which has been upheld as a valid restriction consistent with the Second Amendment. (*Id*. at p. 581.) Similarly, in *Zachary H.*, the court explained that *Heller* and *Bruen* did not affect the constitutionality of Family Code section 6389. (*Zachary H. supra*, 96 Cal.App.5th at p. 1144.) Specifically, the court held that "*Bruen* does not call into question the lawfulness of firearms restrictions imposed on individuals subject to restraining orders." (*Id*. at p. 1145.)

Thus, even before *Rahimi*, firearm restrictions pursuant to a restraining order similar to those authorized by section 18175 were found not to violate the Second Amendment. *Rahimi* merely affirmed what California courts had already held—an

17

individual determined by a court "to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." (*Rahimi, supra,* 144 S.Ct. at p. 1903.)

Krepchin argues that *Rahimi* is not controlling here because the standard for issuance of a gun violence restraining order under section 18175 is different from the standards in 18 U.S.C. § 922(g)(8). He notes that while the federal statute requires a "credible or clear threat" to one's physical safety, section 18175 requires "clear and convincing evidence" of a significant danger. Accordingly, he argues, *Rahimi* is inapplicable and does not demonstrate that section 18175 is consistent with the Second Amendment.

We find the distinction unavailing. In *Rahimi*, the Court found the federal statute to be consistent with the Second Amendment based on the history of our nation's firearm laws, which have included "provisions preventing individuals who threaten physical harm to others from misusing firearms." (*Rahimi, supra*, 144 S.Ct. at p. 1896.) Just as the Court found the federal statute to fit comfortably within that tradition, we also find section 18175 to fit comfortably within that tradition. (*Ibid*.) If anything, section 18175 imposes a heightened evidentiary standard by requiring "clear and convincing evidence," language that does not appear in the federal statute.

In addition, as we have explained, California courts have held that the domestic violence restraining order statute is a constitutionally valid restriction on an individual's right to possess a firearm. (*Zachary H., supra*, 96 Cal.App.5th at p. 1144.) Section 18175, which was based on the domestic violence restraining order statute, fits within that framework and nothing in *Rahimi* calls into question the lawfulness of firearms restrictions imposed on individuals subject to restraining orders. (*Id.* at p. 1145.)

The United States Supreme Court has described a facial challenge to a statute as the " 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the [statute] would be valid.' "

18

(*Rahimi,* 144 S.Ct. at p. 1898, quoting *United States v. Salerno* (1987) 481 U.S. 739, 745.) Krepchin has failed to mount that challenge successfully here.

### B. *Alleged procedural defects*

Krepchin argues that the GVRO was procedurally defective in two ways. First, he contends the GVRO is void because the police department did not submit its petition using the mandated judicial council form, GV-100.

However, Krepchin has not supported this argument with any legal authority. For instance, he asserts that the Judicial Council "has adopted form GV-100 as the sole method of petitioning a trial court for a long term GVRO," but cites no authority for that proposition. We consider the point waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [when appellant fails to support a point with reasoned argument and citations to authority, court may treat it as waived].)

In addition, even accepting Krepchin's factual and legal assertions as true, he failed to articulate any prejudice in his opening brief. Accordingly, the argument fails. (*Century Surety Company v. Polisso* (2006) 139 Cal.App.4th 922, 963 (*Century Surety*) ["we cannot presume prejudice and will not reverse the judgment in the absence of an affirmative showing there was a miscarriage of justice"]; *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1292 ["[a]rguments presented for the first time in an appellant's reply brief are considered waived"].)

Second, Krepchin argues that the GVRO is void because it fails to state the grounds supporting its issuance. He cites section 18180, which enumerates certain information that must be included in a gun violence restraining order, such as a "statement of the grounds supporting the issuance of the order." (§ 18180, subd. (a)(1).) Krepchin notes that the GVRO checked the box on the judicial council form stating that "[t]he facts as stated in the Petition and supporting documents, which are incorporated here by reference, establish sufficient grounds for issuance of this Order," but did not otherwise articulate any such grounds. He argues, though, that the GVRO could not have

19

incorporated any statement of grounds from the petition, because no petition was filed. This failure by the trial court, he contends, constitutes a complete failure to find on a material issue, which is therefore "against law."

We conclude that the GVRO complied with the requirements of section 18180 and, even if it did not, Krepchin has again failed to demonstrate any prejudice. First, the GVRO specified that it incorporated supporting documents by reference, an option that is expressly included on the judicial council form. And, as summarized in the factual background above, those supporting documents included the application for the emergency gun violence restraining order submitted by the police department, in which Roldan set forth his grounds for reasonable cause to support issuance of the order. Nothing in section 18180 requires more.

Second, even if the incorporation by reference here did not satisfy the requirements of section 18180, Krepchin has failed to identify any prejudice. Contrary to Krepchin's assertions, the trial court did not fail to find on a material issue. In addition to the supporting documents incorporated by reference in the GVRO, the trial court announced its findings from the bench at the conclusion of the hearing, stating that the department had shown "by clear and convincing evidence, that Mr. Krepchin poses a significant danger now or in the future of causing personal injury to himself or to others by having a firearm and that a restraining order is necessary to [prevent] that danger."

The GVRO was not procedurally defective.

### C. Expert witness

Krepchin argues that the trial court abused its discretion by qualifying Herbek as an expert in threat assessment. Specifically, he contends that, while Herbek "did demonstrate training in the area of risk assessment, at no point did he demonstrate that as a result of this training he had developed a level of expertise in the field of risk assessment sufficient to allow him to testify as an expert." Further, he argues, the

requisite foundation was not laid because the trial court merely assumed Herbek had sufficient knowledge because he had gone through certain training.

A person is qualified to testify as an expert if that person has special knowledge, skill, experience, training or education sufficient to qualify as an expert on the subject to which the testimony relates. (Evid. Code, § 720.) " '[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547, quoting *People v. Cole* (1956) 47 Cal.2d 99, 103; see also, *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 ["foundation required to establish the expert's qualifications is a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion"].)

Here, Herbek was offered as an expert in police threat assessment. He testified to his specialized training and experience related to the investigation of cases involving gun violence restraining orders. Specifically, he had taken the police department's on-board training for its behavioral threat assessment team, through which he became a member of the Association of Threat Assessment Professionals. Herbek had also received training in obtaining gun violence restraining orders. He testified that he is a member of the police department's crisis negotiation team, has taken the FBI's basic negotiator course, and is a member of the California Association of Hostage Negotiators. At the time of the hearing, Herbek stated that he had conducted between five and 20 threat assessments. Based on that foundation, the trial court qualified Herbek to testify as an expert on threat assessment, "because he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which he is testifying."

21

We will not disturb a trial court's determination regarding a witness's qualification to serve as an expert, absent a manifest abuse of discretion. (*People v. Brown* (2014) 59 Cal.4th 86, 100.) Krepchin argues only that "it appears that the court merely assumed that Herbek had the requisite knowledge because he had gone through certain training." As the record above demonstrates, though, Herbek testified to more than merely having gone through training. Herbek's opinions were based on his special knowledge, skill, experience, training or education on a topic sufficiently beyond the common experience of a trier of fact. (*See, e.g., People v. Sta Ana* (2021) 73 Cal.App.5th 44, 59.) We do not view the trial court's determination to qualify Herbek as an expert in threat assessment as an abuse of discretion.

### D. Hearsay

At the hearing, Herbek testified to numerous statements made by others who were not called as witnesses. For instance, he described Roldan's observations and report, including statements made to Roldan by Krepchin's former supervisor and co-worker. That evidence included the 2009 middle-school incident and the 2021 incident involving the neighbor's call to the police department. Krepchin objected to the testimony throughout the hearing as improper hearsay evidence.

Krepchin argues that the trial court relied heavily on this testimony, which constituted the "wholesale admission of extremely prejudicial, often multiple level, hearsay evidence against [him] which cast him as an unstable individual with mental health issues, struggling with violent tendencies, who appeared to have targeted former co-workers and a girlfriend for potential retribution." According to Krepchin, the admission of this hearsay evidence violated his due process rights and constituted a prejudicial abuse of discretion, because the testimony was not subject to cross-examination, so Krepchin was "largely defenseless" against it.

He argues that section 18175 does not authorize the admission of such hearsay evidence at a gun violence restraining order hearing. Instead, he contends that the lone

case addressing this question—*Geoffrey S.*—incorrectly interpreted section 18175 as authorizing admission of hearsay evidence, and this court should decline to follow it.

The police department concedes that hearsay evidence was admitted into evidence over Krepchin's objection, but argues that it was proper to do so pursuant to *Geoffrey S.*

As we explain below, we agree with the analysis in *Geoffrey S.* that section 18175 authorizes a trial court to consider hearsay evidence at a hearing for a gun violence restraining order.

### 1. Applicable law and standard of review

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' (Evid. Code, § 1200, subd. (a).) .... Hearsay evidence is generally inadmissible unless it satisfies a statutory exception. (Evid. Code, § 1200, subd. (b).)" (*People v. Turner* (2020) 10 Cal.5th 786, 821.)

In *Geoffrey S.*, Division One of the Fourth District Court of Appeal held that section 18175 constitutes one such exception, so that hearsay evidence is admissible at a gun violence restraining order hearing, based on the statute's language, purpose and legislative history, as well as its similarity to the workplace violence and civil harassment restraining order statutes. (*Geoffrey S., supra*, 86 Cal.App.5th at pp. 558–559.)

The trial court here relied on the holding in *Geoffrey S.* to admit hearsay testimony at the GVRO hearing. No other published case appears to have addressed the question of whether hearsay evidence is admissible in a section 18175 hearing. Krepchin argues that *Geoffrey S.* was wrongly decided, and this court should decline to follow it. According to Krepchin, a plain reading of section 18175 "does not support a clear legislative intent to abandon the hearsay rule."

We review matters of statutory interpretation de novo. (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 194–195.) Evidentiary rulings by the trial court are reviewed for prejudicial abuse of discretion. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446–447.)

"Claims of evidentiary error under California law are reviewed for prejudice applying the 'miscarriage of justice' or 'reasonably probable' harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [citation], that is embodied in article VI, section 13 of the California Constitution. Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred." (*Id.* at p. 447.)

### 2. *Analysis*

We begin with an overview of *Geoffrey S.* In that case, over a period of several days, the San Diego Police Department had multiple interactions with an individual, Geoffrey, who was exhibiting troubling signs of paranoia, anxiety, panic, and delusional thoughts, both in person and via on-line communications. (*Geoffrey S., supra,* 86 Cal.App.5th at p. 559.) Geoffrey had been "posting angrily on Facebook about buying ammo," made numerous attempts to acquire additional ammunition, and expressed a "strong need to defend himself with his firearms against a government takeover," including stating: " 'I guess I'm just going to have to take things into my own hands.' " (*Id*. at p. 559.)

After one interaction, the police and a clinician with the psychiatric emergency response team believed Geoffrey was a potential danger to others and placed him on a 72-hour psychiatric hold pursuant to Welfare and Institutions Code section 5150. (*Geoffrey S., supra,* 86 Cal.App.5th at p. 560.) The San Diego Police Department then filed a petition for a gun violence restraining order. In support, they attached a declaration from a police detective, and four redacted police reports that described the various police contacts with Geoffrey, including numerous statements from third parties regarding Geoffrey's behavior and statements. (*Id*. at p. 549.)

The trial court issued an emergency restraining order, and then held a hearing pursuant to section 18175. (*Geoffrey S., supra,* 86 Cal.App.5th at p. 560.) The San Diego Police Department did not submit any additional evidence at the hearing, and no

24

witnesses testified. (*Id*. at p. 561.) Geoffrey made hearsay objections to the witness statements and Facebook posts that were summarized in the police reports. (*Ibid*.) At the conclusion of the hearing, the trial court granted a one-year gun violence restraining order against Geoffrey. (*Id*. at p. 563.)

On appeal, Geoffrey argued that hearsay evidence is inadmissible at a section 18175 hearing. (*Geoffrey S., supra,* 86 Cal.App.5th at p. 565.) Applying the rationale used in one of its previous decisions interpreting the workplace violence restraining order statutes—*Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550 (*Kaiser*)— the court of appeal analyzed the "language, purpose, and legislative history of the GVRO statute, and its similarity to the WVRO and CHRO statutes," and held that hearsay evidence is admissible at gun violence restraining order hearings as well. (*Geoffrey S., supra,* at p. 569.)

The court began with the statutory language of section 18175, which states that a court "shall consider evidence" of the factors listed in section 18155, subdivision (b)(1), and "may consider any other evidence of an increased risk for violence," including the factors listed in section 18155, subdivision (b)(2). (*Geoffrey S., supra*, 86 Cal.App.5th at p. 569.) Further, the court noted, the Evidence Code expressly defines hearsay as a form of evidence: "Hearsay evidence is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Finally, because the ordinary meaning of "any" is "without limit and no matter what kind," the court explained, "the statutory terms 'evidence' and 'any other evidence' as used in Penal Code section 18175, subdivision (a), logically include the form of 'evidence' defined as 'hearsay evidence.' " (*Geoffrey S., supra,* at pp. 569–570, quoting Evid. Code, § 1200, subd. (a); *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.)

The court also noted that section 18175, subdivision (a), allows a trial court to consider evidence of the facts identified in section 18155, subdivision (b)(2), which in

25

turn expressly lists documentary evidence such as police reports. (*Geoffrey S., supra*, 86 Cal.App.5th at p. 570.) "Documentary evidence and police reports offered for the truth of the matter asserted are classic forms of hearsay," the court explained. (*Ibid*.) The inclusion of such evidence in sections 18175 and 1855 thus signals the Legislature's intent that "evidence" and "any other evidence" includes hearsay evidence. (*Id*. at pp. 570–571.)

The court also emphasized the truncated and expedited proceedings set forth in the gun violence restraining order statutes, noting that they are intended "to prevent a threat of harm and designed to take less than a month to litigate from beginning to end." (*Geoffrey S., supra,* 86 Cal.App.5th at p. 571.) In addition, the proceedings "all contemplate an initial ex parte or emergency order to be issued immediately for a limited duration of 21 days, followed by a noticed hearing to be held within 21 days of the initial order for the court to determine whether to issue a long-term restraining order." (*Ibid*.) And a gun violence restraining order proceeding is heard by the court, rather than a jury, based on the clear and convincing evidence standard, "by judges who 'are particularly aware of the potential unreliability of hearsay evidence' and 'are likely to keep this in mind when weighing all of the evidence presented.' " (*Id*. at p. 571, quoting *Kaiser, supra,* 201 Cal.App.4th at p. 557.)

The court also relied on section 18175's similarity to the statutory schemes for the workplace violence and civil harassment restraining orders—Code of Civil Procedure, sections 527.6, subd. (u)(1), and 527.8, subd. (s)(1)—which have both been interpreted to authorize admission of hearsay evidence. "It would be anomalous to conclude that hearsay evidence may be used to obtain such a firearm prohibition under the WVRO and CHRO statutes, but not under the GVRO statute, which more directly targets gun violence. To resolve any ambiguity, we must adopt 'the construction which best serves to

26

harmonize the statute internally *and with related statutes.'* " (*Geoffrey S., supra*, 86 Cal.App.5th at p. 572, quoting *Hsu v. Abbara* (1995) 9 Cal.4th 863, 871, italics added.)[5]

We agree with the court's analysis in *Geoffrey S.* and similarly conclude that section 18175 authorizes the consideration of hearsay by a trial court when determining whether to issue a gun violence restraining order.

Krepchin argues that section 18175 is "silent as to the admissibility of hearsay evidence." Under a plain reading of the statute, he argues, "nothing in its wording indicates that the Legislature intended to allow hearsay, as the word 'hearsay' never appears, nor is there anything indicating that the usual rules of evidence do not apply." For the reasons set forth above, we disagree. Although the statute does not use the word "hearsay," the Evidence Code expressly defines hearsay as a form of evidence, and section 18175 allows a trial court to consider "any other evidence of an increased risk for violence."

Krepchin also argues that *Geoffrey S.* was wrongly decided because the court improperly analogized to its earlier decision in *Kaiser*, "which held that hearsay evidence is admissible in workplace violence restraining order hearings pursuant to Code of Civil Procedure section 527.8." He contends that the language in section 18175 is "quite different" from that in Code of Civil Procedure section 527.8, subdivision (j), as the latter allows a trial court "to receive any testimony that is relevant, which suggests that relevance is the only standard."

---

[5] The court also examined the legislative history of section 18175, which it did not find "to be particular helpful in deciding the question before us." (*Geoffrey S., supra,* 86 Cal.App.5th at p. 572.) Nevertheless, the court traced the progression of the statutory revisions through the legislative process, which it felt "indicates that the Legislature deliberately expanded the language of the bill to permit courts to consider not only the specific factors listed in section 18155, subdivision (b), but also 'any other evidence' relevant to show 'an increased risk for violence.' " (*Id.* at pp. 572–573; § 18175, subd. (a).) "To the extent this history is helpful at all," the court stated, "it bolsters our conclusion that the rationale of *Kaiser* applies here as well." (*Geoffrey S., supra*, at p. 573.)

However, as our summary of *Geoffrey S.* above demonstrates, the court did not base its interpretation of section 18175 solely on its decision in *Kaiser*, but rather chiefly on the statutory language itself. (*Geoffrey S., supra*, 86 Cal.App.5th at p. 569 ["We begin with the statutory language."].) Although the court did summarize *Kaiser* at length, it did so to demonstrate that it would apply the *same rationale* it used in that case to interpret the relevant statute—that is, by analyzing the language, purpose, and legislative history of the gun violence restraining order statute, as well as the similarity of the work violence and civil harassment restraining order statutes. (*Ibid.*)

The dissent in *Geoffrey S.* similarly faulted the majority for "start[ing] down the wrong path in its first sentence by focusing on [*Kaiser*]—a case that dealt with dissimilar language in an entirely different statute—instead of looking to the words of the GVRO statute, section 18175. Bypassing the relevant statutory language may be understandable." (*Geoffrey S., supra*, 86 Cal.App.5th at pp. 583–584 [Dota, J., dissenting].) We do not read the majority's opinion in *Geoffrey S.* in that manner. Instead, the court did look directly to the words of the statute and interpreted them as providing that a trial court may consider hearsay evidence at a gun violence restraining order hearing. (*Id.* at p. 559.)

Krepchin also argues that Family Code section 6220, rather than section 527.8, "is the appropriate model for interpreting legislative intent when analyzing the applicability of the hearsay rule to Penal Code section 18175." He claims that "courts have applied the hearsay rule in noticed hearings for domestic violence restraining orders," citing *Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, and *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139. However, the cited cases demonstrate only that the trial courts in those particular instances may have opted not to consider certain hearsay evidence, an approach that is entirely consistent with the interpretation of section 18175 reached by the court in *Geoffrey S.* and here—that a trial court *may* consider hearsay evidence of an increased risk for violence. (§ 18175, subd. (a).)

28

In addition to his critique of *Geoffrey S.*, Krepchin makes various other arguments regarding consideration of the hearsay evidence.  First, he argues that the principles of due process are not consistent with the admission of hearsay evidence in a gun violence restraining order hearing.  He contends that, "where a petitioner seeking a gun violence restraining order has offered testimony as to threats of violence, the respondent has a due process right to cross-examine the witness with respect to those allegations."

In a civil proceeding, "the right to confront and cross-examine witnesses derives from the due process clauses of the state and federal constitutions."  (*Geoffrey S., supra*, 86 Cal.App.5th at p. 559, citing *People v. Orey* (2021) 63 Cal.App.5th 529, 559.)  "When the petitioner calls live witnesses at a GVRO hearing, the respondent has a due process right to confront and cross-examine them. (See, e.g., *CSV Hospitality Management LLC v. Lucas* (2022) 84 Cal.App.5th 117, 124–125 [right to cross-examine testifying witness at WVRO hearing].) Likewise, if the petitioner relies on hearsay evidence, the respondent has a due process right to call the hearsay declarants and cross-examine them on the stand. [Citations]."  (*Geoffrey S., supra,* at pp. 574–575.)

Krepchin is correct, therefore, that he had a due process right to call the hearsay declarants and cross-examine them as witnesses at the hearing for the GVRO, subject to the trial court's inherent authority to properly manage such a hearing and make decisions about the admission of relevant evidence.  However, there is no evidence that Krepchin requested or attempted to call the hearsay declarants as witnesses and was denied that right.  Contrary to Krepchin's assertions, the mere consideration of the hearsay evidence by the trial court did not violate his due process rights.

Second, Krepchin argues that the testimony regarding the 2009 middle-school incident violated Welfare and Institutions Code section 827.95, which precludes California law enforcement agencies from releasing copies of juvenile police records for certain minors.  Even assuming Krepchin is correct, though, he has failed to demonstrate how any such error was prejudicial.  (*Century Surety, supra*, 139 Cal.App.4th at p. 963.)

29

There is no indication that the trial court placed any significant weight on the 2009 middle-school incident. Instead, in announcing its ruling, the trial court chiefly relied on the note found in Krepchin's apartment: "There was a note, which is Petitioner's Exhibit 1, which the Court considered very important in this case, and -- and it seems clear to the Court that this note was an expression of an intent to plan or planning of an act of violence; that that's what Mr. Krepchin intended to do. I know that there was evidence -- there was testimony from Dr. Greene where he attempted to minimize the significance of the note, but the Court did not find his explanation persuasive."

Further, the trial court stated: "I also note that Mr. Krepchin had no explanation for the note when he spoke with the doctor, which seemed very unusual and concerning. And when you look at that note, it's clear to see why the -- the officers were very concerned about Mr. Krepchin and brought this request for a restraining order." Finally, the court stated: "When you look at the links between the contents of that note and recent events, when that note was discovered, in Mr. Krepchin's life, the breaking up with the girlfriend, the losing his job, et cetera, it -- it makes that note very significant."

Thus, even if it was error to admit evidence of the 2009 middle-school incident, it was harmless.

Third, Krepchin argues that admission of hearsay statements regarding his mental health violated California's right to privacy laws. Again, though, even assuming Krepchin is correct, he has failed to demonstrate how any such error was prejudicial. (*Century Surety, supra*, 139 Cal.App.4th at p. 963.)

### E. Substantial evidence

Krepchin contends that "the evidence was insufficient to support the verdict." We review a trial court's factual findings on the elements necessary for a gun violence restraining order for substantial evidence. (*Geoffrey S., supra,* 86 Cal.App.5th at p. 575, citing *Technology Credit Union v. Rafat* (2022) 82 Cal.App.5th 314, 323.) In conducting that review, "we must take into account the clear and convincing evidence standard of

proof mandated by [section 18175, subd. (b)]." (*Geoffrey S., supra*, at p. 575, citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012 (*O.B.*).) "Clear and convincing evidence requires a finding of high probability." (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.)

" 'When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*Geoffrey S., supra,* 86 Cal.App.5th at p. 576, quoting *O.B.*, supra, 9 Cal. 5th at p. 1011.) We must therefore determine whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that Krepchin posed a significant danger of gun violence. (§ 18175, subd. (b)(1); *Geoffrey S., supra*, at p. 576.) We review the record in the light most favorable to the prevailing party " 'and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*Geoffrey S*., *supra*, at p. 576, quoting *O.B., supra*, at pp. 1011–1012.)

Applying these principles, we conclude there is substantial evidence to support the finding of a high probability that Krepchin posed a significant danger of committing gun violence. That evidence includes the note; the law enforcement equipment observed in Krepchin's apartment and car; Krepchin's report of an armed robbery that police believed did not occur; and the information shared by Krepchin's former employer and co-worker regarding his work performance, the hitlist, and his ex-girlfriend.

In challenging the sufficiency of the evidence in the record, Krepchin repeats his arguments regarding the hearsay evidence admitted during the hearing. He asserts that the trial court "relied heavily on the 'concerns' expressed by the City's officers." As we have explained, though, the trial court was entitled to consider that evidence. Moreover,

Krepchin ignores the substantial non-hearsay evidence summarized above on which the trial court based its decision.

Krepchin also argues that the trial court erred by not giving sufficient weight to the testimony of his expert witness, Dr. Greene. For instance, he states that Greene "was a highly credible witness employed with a history of employment as an expert witness by both the state and defense. His testimony was the only significant non-hearsay based evidence heard by the court and was based upon a careful and professional analysis of defendant's threat level to the community. The court's decision to disregard his testimony as unpersuasive was unfounded and an abuse of discretion."

Again, though, we must give appropriate deference to how the trial court evaluated the credibility of witnesses and resolved conflicts in the evidence. (*Geoffrey S.*, *supra*, 86 Cal.App.5th at p. 576.) The trial court directly addressed Greene's testimony where he attempted to minimize the significance of the note in Krepchin's apartment, and the court explained that it did not find Greene's explanation persuasive, especially in light of the fact that Krepchin had no explanation for the note when he spoke with Greene, "which seemed very unusual and concerning." Giving the trial court's evaluation of Greene's testimony appropriate deference, we conclude there is substantial evidence to support the court's findings in the GVRO.

### III. DISPOSITION

The order is affirmed. Respondent shall recover its costs on appeal.

_____
         Wilson, J.


WE CONCUR:




_____
   Greenwood, P. J.




_____
   Bamattre-Manoukian, J.




*Mountain View Police Department v. Krepchin*
H050872

Trial Court:       Santa Clara County

Trial Judge:       The Honorable Christine Garcia-Sen

Counsel:           Lance Bayer, Mountain View City Attorney's Office,
                   for Plaintiff and Respondent

                   Schweitzer & Davidian, A.P.C., Eric Hans Schweitzer, and
                   Law Office of Jim Vorhies, Jim H. Vorhies,
                   for Defendant and Appellant.

*Mountain View Police Department v. Krepchin*
H050872